

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ROBERT DAVIS,**
Plaintiff,

Case:2:16-cv-12755
Judge: Murphy, Stephen J.
MJ: Majzoub, Mona K.
Filed: 07-26-2016 At 12:26 PM
CMP DAVIS V SCHILLER, ET AL (BG)

v

**STEVEN M. SCHILLER,** in his official and individual capacities as the duly appointed Emergency Manager for the Highland Park School District Under Public Act 436 of 2012, **and STEVE ARWOOD,** in his official and individual capacities as Director of the Department of Talent and Economic Development,
Defendants,

_____/

ROBERT DAVIS
*Pro Se Plaintiff*
180 Eason
Highland Park, MI 48203
(313) 523-7118
Davisrobert854@gmail.com

_____/

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

NOW COMES PLAINTIFF, ROBERT DAVIS, in his own proper person,

and for his Verified Complaint for Declaratory Judgment and Injunctive Relief

("**Verified Complaint**"), states the following:

## I.     NATURE OF PLAINTIFF'S CLAIMS

1. Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367; and the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

2. Plaintiff alleges in **Count I** of the Verified Complaint that a declaratory judgment should be issued by the Court declaring that the Defendants, individually and collectively, have violated Plaintiff's fundamental constitutional right to vote by unlawfully using funds from the Highland Park School District's Sinking Fund without first obtaining approval from the Plaintiff and other registered voters of the City of Highland Park in accordance with Mich. Comp. Laws § 380.1216.

3. Plaintiff alleges in **Count II** of the Verified Complaint that a declaratory judgment should be issued by the Court declaring that the Defendants, individually and collectively, violated Plaintiff's substantive due process rights by unlawfully using funds from the Highland Park School District's Sinking Fund without first obtaining approval from the Plaintiff and other registered voters for the City of Highland Park in accordance Mich. Comp. Laws § 380.1216.

4. Plaintiff alleges in **Count III** of the Verified Complaint that a declaratory judgment should be issued by the Court declaring that the Defendant

Emergency Manager violated Plaintiff's procedural due process rights by failing to have an independent audit conducted on the Highland Park School District's Sinking Fund for the 2012-2013, 2013-2014, and 2014-2015 fiscal years as required by Mich. Comp. Laws § 380.1212 of the Revised School Code and failing to have said audit reports available for public inspection in accordance with Mich. Const. 1963, art. 9, § 23.

5. Plaintiff alleges in **Count IV** of the Verified Complaint that a declaratory judgment should be issued declaring that Mich. Comp. Laws § 380.1212 of the Revised School Code requires the Defendant Emergency Manager to have an independent audit conducted on the Highland Park School District's Sinking Fund for the 2012-2013, 2013-2014, and 2014-2015 fiscal years.

6. Plaintiff alleges in **Count V** of the Verified Complaint that injunctive relief should be granted preliminarily and permanently enjoining the Defendants, individually and collectively, from using any funds from the Highland Park School District's Sinking Fund to assist in the costs of the demolition of the Highland Park Community High School.

7. In **Count VI** of the Verified Complaint, Plaintiff seeks an award of compensatory, punitive and nominal damages against the Defendants Emergency Manager and Arwood, in their individual capacities, for violating Plaintiff Davis' Constitutional Rights.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over Plaintiff's claims pursuant to 42 U.S.C. 1983; 28 U.S.C. §§ 1331, 1337, 1343, and 1367.

9. This Court also has jurisdiction to render and issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq.*

10. Venue is proper under 28 U.S.C. § 1391 because Plaintiff is a resident of the Eastern District of Michigan, and the actions giving rise to this Complaint all occurred within the Eastern District of Michigan.

## III. PARTIES

11. Plaintiff, Robert Davis[1] (**"Plaintiff Davis"**), is a registered elector of the City of Highland Park, County of Wayne, State of Michigan. Plaintiff Davis is also a well-known community and union activist, who has volunteered and been involved in many civic and political causes. (**See Plaintiff Davis' Affidavit attached hereto as Exhibit A**).

---

[1] On September 2, 2014, Plaintiff Davis pled guilty before Senior United States District Court Judge Arthur Tarnow ("Judge Tarnow") in Criminal Case No. 12-20224. On December 18, 2014, Judge Tarnow sentenced Plaintiff Davis to serve 18 months at a minimum security camp in Montgomery, Alabama on the Maxwell Air Force Base ("FPC Montgomery"). Plaintiff Davis began serving his term of imprisonment at FPC Montgomery on March 13, 2015 and on July 1, 2016, Plaintiff was released from the custody and supervision of the Federal Bureau of Prisons (**"BOP"**).

12. Defendant Steven M. Schiller ("**Defendant Emergency Manager**"), is the duly appointed Emergency Manager for the Highland Park School District under Public Act 436 of 2012 ("**Public Act 436**").  In accordance with Public Act 436, Defendant Emergency Manager was appointed by the Governor of the State of Michigan, Rick Snyder, and Defendant Emergency Manager exercises solely all powers, rights, and privileges on behalf of the Highland Park School District.  (**See Defendant Emergency Manager's Contract attached hereto as Exhibit B**).

13. Defendant Steve Arwood ("**Defendant Arwood**"), is the duly appointed Director of the Department of Talent and Economic Development.  Pursuant to Executive Order 2014-12, Defendant Arwood oversees and administers all functions, powers and responsibilities of the Michigan Land Bank Fast Track Authority.  (**See Executive Order 2014-12 attached hereto as Exhibit C**).

## IV.    COMMON FACTS FOR COUNTS I-VII

14. On December 30, 2015, Defendant Arwood, on behalf of the Michigan Land Bank Fast Track Authority, submitted an application to the Michigan State Housing Development Authority seeking a grant of $2 million to demolish the Highland Park Community High School.  Although Defendant Arwood's application only sought a grant of $2 million, the application

revealed that the total demolition project to demolish Highland Park Community High School would cost approximately $2.4 million. (See **Project Application attached hereto as Exhibit D**).

15. The grant application submitted by Defendant Arwood further revealed that the demolition project to demolish Highland Park Community High School would require a $400,000 contribution from the Highland Park School District's Sinking Fund. (See **Project Application attached hereto as Exhibit D**).

16. On February 9, 2016, on behalf of the Michigan Land Bank Fast Track Authority, Defendant Arwood executed a "Site Access and Demolition Agreement" with the former Mayor of the City of Highland Park, DeAndre Windom, and the former Emergency Manager for the Highland Park School District, Donald Weatherspoon, to demolish the Highland Park Community High School, located at 15900 Woodward Ave. (See **Site Access and Demolition Agreement attached hereto as Exhibit E**).

17. The Highland Park Community High School's structure is owned by the Highland Park School District and the land on which it was constructed is owned by the City of Highland Park. (See **Site Access and Demolition Agreement attached hereto as Exhibit E**).

18. On February 24, 2016, the Defendant Emergency Manager and Defendant Arwood entered into an agreement to create an "Escrow Account" for the purpose of transferring $500,000 from the Highland Park School District's Sinking Fund to cover costs of the demolition of the Highland Park Community High School. **(See Escrow Agreement attached hereto as Exhibit F).**

19. In fact, in accordance with Public Act 436, on that same day, February 24, 2016, the Defendant Emergency Manager also issued an order authorizing the use of funds from the Highland Park School District's Sinking Fund to be used to pay for the demolition costs of the Highland Park Community High School. **(See Defendant Emergency Manager's February 24, 2016 Order attached hereto as Exhibit G).**

20. On April 13, 2016, in accordance with the executed Escrow Agreement **(Exhibit F)** and the February 24, 2016 Order **(Exhibit G)**, the Defendant Emergency Manager authorized the electronic transfer of $500,000 from the Highland Park School District's Sinking Fund to the newly created Escrow Fund for the purpose of covering the costs of the demolition of the Highland Park Community High School. **(See Emails authorizing transfer of funds attached hereto as Exhibit H).**

21. On June 3, 2016, Plaintiff Davis sent, via electronic mail, a request to the Defendant Emergency Manager requesting a copy of the audit reports for the Highland Park School District's Sinking Fund for the fiscal years of 2012-2013, 2013-2014, 2014-2015 in accordance with Mich. Const. 1963, art. 9, § 23. **(See Plaintiff's June 3, 2016 Email to Defendant Emergency Manager attached hereto as Exhibit I).**

22. On June 27, 2016, through his FOIA Coordinator, the Defendant Emergency Manager issued a response to Plaintiff Davis' June 3, 2016 written request, and informed Plaintiff Davis that the Sinking Fund was not audited for the 2012-2013, 2013-2014, and 2014-2015 fiscal years and thus, no copies of any audit reports existed. **(See Defendant Emergency Manager's June 27, 2016 written response to Plaintiff attached hereto as Exhibit J).**

23. On June 16, 2016, Plaintiff Davis sent, via electronic mail, a request to the Michigan Land Bank Fast Track Authority seeking documents pertaining to the demolition of the Highland Park Community High School. **(See Plaintiff's June 16, 2016 Email to Michigan Land Bank Fast Track Authority attached hereto as Exhibit K).**

24. On July 8, 2016, through its legal counsel Patrick Ennis, the Michigan Land Bank Fast Track Authority responded to Plaintiff Davis' June 16, 2016

request for documents and provided Plaintiff Davis with copies of various contacts and agreements entered into with the Defendant Emergency Manager. **(See Michigan Land Bank Fast Track Authority's July 8, 2016 Response to Plaintiff attached hereto as Exhibit L)**.

25. The Defendant Emergency Manager unlawfully authorized the use of funds from the Highland Park School District's Sinking Fund for an impermissible purpose without first obtaining the approval from the majority of electors from the City of Highland Park. **(See Plaintiff's affidavit attached hereto as Exhibit A)**.

26. Moreover, and perhaps more importantly, the Revised School Code, being Mich. Comp. Laws § 380.1212, does not permit the use of funds from the Highland Park School District's Sinking Fund to be used for the purpose of demolishing a school structure when it's not for the purpose of building or improving a new or existing school facility. **(See Plaintiff's affidavit attached hereto as Exhibit A)**.

27. As noted in the Defendant Emergency Manager's February 24, 2016 Order, the predecessor to the Defendant Emergency Manager, on behalf of the Highland Park School District, entered into an amendment to the Reciprocal Lease Agreement on March 30, 2015 with the City of Highland Park wherein the Highland Park School District agreed to convey back to the City

of Highland Park for valuable consideration its interest in the land leases for the Highland Park High School. The conveyance was contingent upon funding becoming available from the Michigan State Housing Development Authority to pay for the costs of the demolition and removal of the Highland Park Community High School. **(See Defendant Emergency Manager's February 24, 2016 Order attached hereto as Exhibit G)**.

28. Funds from the Highland Park School District's Sinking Fund can only be used for specific purposes. Mich. Comp. Laws § 380.1212 of the Revised School Code governs local school district's sinking funds. Mich. Comp. Laws § 380.1212(1) states in pertinent part:

> "(1) If approved by the school electors of the school district, the board of a school district may levy a tax of not to exceed 5 mills on the state equalized valuation of the school district each year for a period of not to exceed 20 years, **for the purpose of creating a sinking fund to be used for the purchase of real estate for sites for, and the construction or repair of, school buildings**." (Emphasis supplied).

29. It is evident that the demolition of the Highland Park Community High School does not fall within the listed purposes for which funds from a sinking fund can be used for. As noted above, Mich. Comp. Laws § 380.1212(1) of the Revised School Code clearly and unambiguously limits the purposes for which funds from a sinking fund can be used. Demolishing a school building on land owned by the local municipality, is not among the

Page **10** of **38**

approved purposes, especially considering the demolition of the Highland Park Community High School is not for a school-related project. It is believed that the City of Highland Park wants the Highland Park Community High School demolished and removed from the land because the City of Highland Park intends to develop the land for commercial use. (**See Plaintiff's affidavit attached hereto as Exhibit A**).

30. Thus, in order for funds from the Highland Park School District's Sinking Fund to be used for a purpose other than that for which it was raised, the Defendants needed to secure and obtain "the consent of a majority of the school electors of the district voting on the question at a regular or special school election." See Mich. Comp. Laws § 380.1216 of the Revised School Code.

31. To date, a majority of the electors of the City of Highland Park, at a regular or special school election, have not approved the use of Sinking Funds to pay for the costs of the demolition of the Highland Park Community High School. (**See Plaintiff's affidavit attached hereto as Exhibit A**).

32. Plaintiff Davis, as a duly registered and qualified elector of the City of Highland Park, desires to exercise his fundamental constitutional right to vote to vote against using any funds from the Highland Park School District's Sinking Fund to pay for the costs of demolishing and removing the

Highland Park Community High School. **(See Plaintiff's affidavit attached hereto as Exhibit A).**

33. Plaintiff has contacted representatives from the Wayne County Prosecutor's Office and Michigan Attorney General's Office with respect to the Defendant Emergency Manager and Defendant Arwood's unlawful and illegal actions pertaining to the unlawful use of funds from the Highland Park School District's Sinking Fund. **(See Plaintiff's affidavit attached hereto as Exhibit A).**

## V.    CAUSES OF ACTION

## COUNT I

**Defendant Emergency Manager and Defendant Arwood Are Violating Plaintiff's Fundamental Right To Vote By Unlawfully Using Funds From The Highland Park School District's Sinking Fund For An Impermissible Purpose Without First Obtaining A Majority Vote From The Electors of The City of Highland Park Authorizing The Use of Sinking Funds For Said Purpose.**

34. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

35. This claim is brought pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

36. This claim seeks prospective declaratory relief against Defendant Emergency Manager and Defendant Arwood, in their respective official capacities.

37. On December 30, 2015, Defendant Arwood, on behalf of the Michigan Land Bank Fast Track Authority, submitted an application to the Michigan State Housing Development Authority seeking a grant of $2 million to demolish the Highland Park Community High School. Although Defendant Arwood's application only sought a grant of $2 million, the application revealed that the total demolition project to demolish Highland Park Community High School would cost approximately $2.4 million. (**See Project Application attached hereto as Exhibit D**).

38. The grant application submitted by Defendant Arwood further revealed that the demolition project to demolish Highland Park Community High School would require a $400,000 contribution from the Highland Park School District's Sinking Fund. (**See Project Application attached hereto as Exhibit D**).

39. On February 9, 2016, on behalf of the Michigan Land Bank Fast Track Authority, Defendant Arwood executed a "Site Access and Demolition Agreement" with the former Mayor of the City of Highland Park, DeAndre Windom, and the former Emergency Manager for the Highland Park School District, Donald Weatherspoon, to demolish the Highland Park Community High School, located at 15900 Woodward Ave. (**See Site Access and Demolition Agreement attached hereto as Exhibit E**).

40. The Highland Park Community High School's structure is owned by the Highland Park School District and the land on which it was constructed is owned by the City of Highland Park. **(See Site Access and Demolition Agreement attached hereto as Exhibit E)**.

41. On February 24, 2016, the Defendant Emergency Manager and Defendant Arwood entered into an agreement to create an "Escrow Account" for the purpose of transferring $500,000 from the Highland Park School District's Sinking Fund to cover costs of the demolition of the Highland Park Community High School. **(See Escrow Agreement attached hereto as Exhibit F)**.

42. In fact, in accordance with Public Act 436, on that same day, February 24, 2016, the Defendant Emergency Manager also issued an order authorizing the use of funds from the Highland Park School District's Sinking Fund to be used to pay for the demolition costs of the Highland Park Community High School. **(See Defendant Emergency Manager's February 24, 2016 Order attached hereto as Exhibit G)**.

43. On April 13, 2016, in accordance with the executed Escrow Agreement **(Exhibit F)** and the February 24, 2016 Order **(Exhibit G)**, the Defendant Emergency Manager authorized the electronic transfer of $500,000 from the Highland Park School District's Sinking Fund to the newly created Escrow

Fund for the purpose of covering the costs of the demolition of the Highland Park Community High School.  (See Emails authorizing transfer of funds attached hereto as Exhibit H).

44. The Defendant Emergency Manager unlawfully authorized the use of funds from the Highland Park School District's Sinking Fund for an impermissible purpose without first obtaining the approval from the majority of electors from the City of Highland Park.  (See Plaintiff's affidavit attached hereto as Exhibit A).

45. Moreover, and perhaps more importantly, the Revised School Code, being Mich. Comp. Laws § 380.1212, does not permit the use of funds from the Highland Park School District's Sinking Fund to be used for the purpose of demolishing a school structure when it's not for the purpose of building or improving a new or existing school facility.  (See Plaintiff's affidavit attached hereto as Exhibit A).

46. As noted in the Defendant Emergency Manager's February 24, 2016 Order, the predecessor to the Defendant Emergency Manager, on behalf of the Highland Park School District, entered into an amendment to the Reciprocal Lease Agreement on March 30, 2015 with the City of Highland Park wherein the Highland Park School District agreed to convey back to the City of Highland Park for valuable consideration its interest in the land leases for

the Highland Park High School. The conveyance was contingent upon funding becoming available from the Michigan State Housing Development Authority to pay for the costs of the demolition and removal of the Highland Park Community High School. **(See Defendant Emergency Manager's February 24, 2016 Order attached hereto as Exhibit G)**.

47. Funds from the Highland Park School District's Sinking Fund can only be used for specific purposes. Mich. Comp. Laws § 380.1212 of the Revised School Code governs local school district's sinking funds. Mich. Comp. Laws § 380.1212(1) states in pertinent part:

> "(1) If approved by the school electors of the school district, the board of a school district may levy a tax of not to exceed 5 mills on the state equalized valuation of the school district each year for a period of not to exceed 20 years, **for the purpose of creating a sinking fund to be used for the purchase of real estate for sites for, and the construction or repair of, school buildings.**" (Emphasis supplied).

48. It is evident that the demolition of the Highland Park Community High School does not fall within the listed purposes for which funds from a sinking fund can be used for. As noted above, Mich. Comp. Laws § 380.1212(1) of the Revised School Code clearly and unambiguously limits the purposes for which funds from a sinking fund can be used. Demolishing a school building on land owned by the local municipality, is not among the approved purposes, especially considering the demolition of the Highland

Park Community High School is not for a school-related project. It is believed that the City of Highland Park wants the Highland Park Community High School demolished and removed from the land because the City of Highland Park intends to develop the land for commercial use. **(See Plaintiff's affidavit attached hereto as Exhibit A).**

49. Thus, in order for funds from the Highland Park School District's Sinking Fund to be used for a purpose other than that for which it was raised, the Defendants needed to secure and obtain "the consent of a majority of the school electors of the district voting on the question at a regular or special school election." See Mich. Comp. Laws § 380.1216 of the Revised School Code.

50. Mich. Comp. Laws § 380.1216 of the Revised School Code states:

> "Except as provided in the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, as provided in section 15 of the state school aid act of 1979, MCL 388.1615, or for purposes authorized under section 1211(5), **money raised by tax shall not be used for a purpose other than that for which it was raised _without the consent of a majority of the school electors of the district voting on the question at a regular or special school election_.**" (Emphasis supplied).

51. Because the Defendants, individually and collectively, intend to use $500,000 from the Highland Park School District's Sinking Fund to pay for costs associated with the demolition and removal of the Highland Park

Community High School, and said purpose is for a "purpose other than that for which" the sinking fund was raised, pursuant to Mich. Comp. Laws § 380.1216, the Defendants must first receive "consent of a majority of the school electors" of the City of Highland Park.

52. To date, a majority of the electors of the City of Highland Park, including the Plaintiff, have not approved the use of Sinking Funds to pay for the costs of the demolition of the Highland Park Community High School. (**See Plaintiff's affidavit attached hereto as Exhibit A**).

53. Plaintiff Davis, as a duly registered and qualified elector of the City of Highland Park, desires to exercise his fundamental constitutional right to vote to vote against using any funds from the Highland Park School District's Sinking Fund to pay for the costs of demolishing and removing the Highland Park Community High School. However, to date, this fundamental right has been denied Plaintiff and other registered and qualified electors of the City of Highland Park by the Defendants. (**See Plaintiff's affidavit attached hereto as Exhibit A**).

54. "Section 1983 provides a cause of action against any person who, acting under color state law, abridges rights created by the [United States] Constitution or laws of the United States." *Sandusky Co. Democratic Party*

*v Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) (citing *Maine v Thiboutot*, 448 U.S. 1, 4-8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)).

55. "The U.S. Constitution protects an individual's right to vote during an election." *Lawson v Shelby County, TN*, 211 F.3d 331, 336 (6th Cir. 2000).

56. "Members of the public, however, have a 'strong interest in exercising the fundamental political right to vote.'" *Hunter v Hamilton County Bd of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) (quoting *Purcell v Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006)).

57. "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter v Hamilton County Bd of Elections*, 635 F.3d 219, 244 (6th Cir. 2011).

58. "The right to vote is a fundamental right, 'preservative of all rights.'" *League of Women Voters v Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (quoting *Yick Wo v Hopkins*, 118 U.S. 356, 370 (1886)).

59. "The right to vote is a "precious" and "fundamental" right." *Obama for America v Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citing *Harper v Va. State Bd of Elections*, 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

60. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

61. "Our Constitution accords special protection for the fundamental right of voting." *Northeast Ohio Coalition for Homeless v Husted*, 696 F.3d 580, 591 (6th Cir. 2012).

62. Because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v Sims*, 377 U.S. 533, 562 (1964).

63. In the case at bar the Defendants, individually and collectively, are denying Plaintiff Davis his fundamental right to vote by unlawfully using funds from the Highland Park School District's Sinking Fund for an impermissible purpose without first receiving "consent of a majority of the school electors" of the City of Highland Park as Mich. Comp. Laws 380.1216 of the Revised School Code requires. **(See Plaintiff's affidavit attached hereto as Exhibit A)**.

64. Thus, if this Honorable Court declares that the demolition of the Highland Park Community High School is not among the approved purposes for which funds from the Highland Park School District's Sinking Fund can be

used for in accordance with Mich. Comp. Laws § 380.1212 of the Revised School Code, then Mich. Comp. Laws § 380.1216 would be applicable and Defendants would be required to first receive "consent of a majority of the school electors" of the City of Highland Park, including the Plaintiff, before expending any funds from the Highland Park School District's Sinking Fund to pay for costs associated with the demolition and removal of the Highland Park Community High School.

## COUNT II

**Defendant Emergency Manager and Defendant Arwood Are Violating Plaintiff's Substantive Due Process Rights By Unlawfully Using Funds From The Highland Park School District's Sinking Fund For An Impermissible Purpose Without First Obtaining A Majority Vote From The Electors of The City of Highland Park Authorizing The Use of Sinking Funds For Said Purpose.**

65. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

66. This claim is brought pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

67. This claim seeks prospective declaratory relief against Defendant Emergency Manager and Defendant Arwood, in their respective official capacities.

68. "The Fourteenth Amendment prohibits state actors from depriving an individual of life, liberty, or property without due process of law." *Bailey v Floyd County Bd. of Educ.,* 106 F.3d 135, 140-41 (6th Cir. 1997).

69. "The Due Process Clause has a procedural component and a substantive one. The two components are distinct from each other because each has different objectives, and each imposes different constitutional limitations on government power." *Howard v Grinage,* 82 F.3d 1343, 1349 (6th Cir. 1996).

70. "Substantive due process,… serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Howard v Grinage,* 82 F.3d 1343, 1349 (6th Cir. 1996) (internal citations and quotation marks omitted).

71. "Substantive due process serves as a vehicle to limit various aspects of potentially oppressive government action For example, it can serve as a check on legislative enactments thought to infringe on fundamental rights otherwise not explicitly protected by the Bill of Rights; or as a check on official misconduct which infringes on a "fundamental right;" r as a limitation on official misconduct, which although not infringing on a fundamental right, is so literally "conscience shocking" hence oppressive, as to rise to the level of a substantive due process violation." *Howard v Grinage,* 82 F.3d 1343, 1349 (6th Cir. 1996).

72. "Where state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest, and is narrowly drawn to further that state interest." *Kallstrom v City of Columbus,* 136 F.3d 1055, 1064 (6th Cir. 1998).

73. "[W]here a fundamental liberty interest protected by the substantive due process component of the Fourteenth Amendemnt is involvied, the government cannot infringe on that right 'unless the infringement is narrowly tailored to serve a compelling state interest.'" *Johnson v City of Cincinnati*, 310 F.3d 484, 502 (6th Cir. 2002) (quoting *Washington v Glucksberg*, 521 U.S. 702, 721 (1997)).

74. "To state a claim of substantive due process, Plaintiff must allege and show that Defendants deprived him with a "fundamental" right or liberty interest that is accorded special constitutional protection." *Yohn v Coleman*, 639 F.Supp.2d 776, 788 (E.D.Mich. 2009) (citing *Washington v Glucksberg*, 521 U.S. 702, 719-720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997)).

75. On February 24, 2016, the Defendant Emergency Manager and Defendant Arwood entered into an agreement to create an "Escrow Account" for the purpose of transferring $500,000 from the Highland Park School District's Sinking Fund to cover costs of the demolition of the Highland Park

Community High School. **(See Escrow Agreement attached hereto as Exhibit F)**.

76. In fact, in accordance with Public Act 436, on that same day, February 24, 2016, the Defendant Emergency Manager also issued an order authorizing the use of funds from the Highland Park School District's Sinking Fund to be used to pay for the demolition costs of the Highland Park Community High School. **(See Defendant Emergency Manager's February 24, 2016 Order attached hereto as Exhibit G)**.

77. On April 13, 2016, in accordance with the executed Escrow Agreement **(Exhibit F)** and the February 24, 2016 Order **(Exhibit G)**, the Defendant Emergency Manager authorized the electronic transfer of $500,000 from the Highland Park School District's Sinking Fund to the newly created Escrow Fund for the purpose of covering the costs of the demolition of the Highland Park Community High School. **(See Emails authorizing transfer of funds attached hereto as Exhibit II)**.

78. Because the Defendants, individually and collectively, intend to use $500,000 from the Highland Park School District's Sinking Fund to pay for costs associated with the demolition and removal of the Highland Park Community High School, and said purpose is for a "purpose other than that for which" the sinking fund was raised, pursuant to Mich. Comp. Laws §

380.1216, the Defendants must first receive "consent of a majority of the school electors" of the City of Highland Park.

79. As noted, Plaintiff Davis, as a duly registered and qualified elector of the City of Highland Park, desires to exercise his fundamental constitutional right to vote to vote against using any funds from the Highland Park School District's Sinking Fund to pay for the costs of demolishing and removing the Highland Park Community High School. However, to date, this fundamental right has been denied Plaintiff and other registered and qualified electors of the City of Highland Park by the Defendants. (**See Plaintiff's affidavit attached hereto as Exhibit A**).

80. It is well-settled in the Sixth Circuit that "[t]he right to vote is a "precious" and "fundamental" right." *Obama for America v Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citing *Harper v Va. State Bd. of Elections*, 383 U.S.663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)).

81. Since Defendants' unlawful actions to expend funds from the Highland Park School District's Sinking Fund for an impermissible infringe upon Plaintiff Davis' fundamental right to vote, their actions can be "upheld only when they are narrowly tailored to a compelling government interest." *Seal v Morgan*, 229 F.3d 567, 574 (6th Cir. 2000).

82. In light of the fact that Plaintiff Davis, as a registered and qualified elector of the City of Highland Park, has a statutory right under Mich. Comp. Laws § 380.1216 to vote on the question of whether to allow funds from the Highland Park School District's Sinking Fund to be spent to cover costs for the demolition and removal of the Highland Park Community High School, the Defendants cannot satisfy this high burden.

## COUNT III

**Defendant Emergency Manager Violated Plaintiff's Procedural Due Process Rights By Failing To Provide Plaintiff With Copies of Audit Reports for The Highland Park School District's Sinking Fund for the 2012-2013, 2013-2014, 2014-2015 Fiscal Years.**

83. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

84. This claim is brought pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act.

85. This claim seeks prospective declaratory relief against Defendant Emergency Manager, in his official capacity.

86. On June 3, 2016, Plaintiff Davis sent, via electronic mail, a request to the Defendant Emergency Manager requesting a copy of the audit reports for the Highland Park School District's Sinking Fund for the fiscal years of 2012-

2013, 2013-2014, 2014-2015 in accordance with Mich. Const. 1963, art. 9, §

23. **(See Plaintiff's June 3, 2016 Email to Defendant Emergency**

**Manager attached hereto as Exhibit I)**.

87. On June 27, 2016, through his FOIA Coordinator, the Defendant

Emergency Manager issued a response to Plaintiff Davis' June 3, 2016

written request, and informed Plaintiff Davis that the Sinking Fund was not

audited for the 2012-2013, 2013-2014, and 2014-2015 fiscal years and thus,

no copies of any audit reports existed.  **(See Defendant Emergency**

**Manager's June 27, 2016 written response to Plaintiff attached hereto as**

**Exhibit J)**.

88. Pursuant to Mich. Comp. Laws § 380.1212(1) of the Revised School Code,

Defendant Emergency Manager was required to have an independent audit

done for each fiscal year that a tax was levied for a sinking fund for the

Highland Park School District.

89. Mich. Comp. Laws § 380.1212(1) of the Revised School Code states in

pertinent part:

> "**A school district that levies a sinking fund tax under this section**
> **shall have an independent audit of its sinking fund conducted**
> **annually, including a review of the uses of the sinking fund, and**
> **shall submit the audit report to the department of treasury.** If the
> department of treasury determines from the audit report that the
> sinking fund has been used for a purpose other than those authorized
> for the sinking fund under this section, the school district shall repay

the misused funds to the sinking fund from the school district's operating funds and shall not levy a sinking fund tax under this section after the date the department of treasury makes that determination." (Emphasis supplied).

90. Michigan Constitution of 1963, article 9, § 23, further provides in relevant part:

> "**All financial records**, accountings, **audit reports** and other reports of public moneys **shall be public records and open to inspection**." (Emphasis supplied).

91. Thus, from the clear and unambiguous language of Mich. Comp. Laws § 380.1212(1) of the Revised School Code, Defendant Emergency Manager was required to have an independent audit conducted for each fiscal year that a tax was levied for a sinking fund for the Highland Park School District.

92. Admittedly, the Defendant Emergency Manager has failed to comply with and adhere to the provisions of Mich. Comp. Laws § 380.1212(1) of the Revised School Code. (**See Defendant Emergency Manager's June 27, 2016 written response to Plaintiff attached hereto as Exhibit J**).

93. Defendant Emergency Manager's failure to have an independent audit conducted for the requested fiscal years and his subsequent failure to provide Plaintiff Davis with copies of the required audit reports of the Highland Park School District's Sinking Fund violates Plaintiff Davis' procedural due

process rights under the Fourteenth Amendment of the United States Constitution.

94. "The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process." *Bazetta v McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005).

95. "Those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v Austin*, 125 S.Ct. 2384, 2393, 162 L.Ed.2d 174 (2005).

96. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights *prior to* depriving him of the property interest." *Waeschle v Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (internal quotation marks omitted) (Emphasis supplied).

97. "Property interests, of course, are not created by the [United States] Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

98. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd of Regents v Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

99. "State statutes or rules create protected property interests by entitling a citizen to certain benefits." *Daniels v Woodside*, 396 F.3d 730, 736 (6th Cir. 2004).

100. Moreover, a state constitution can create a protected property interest. See *Daniels v Woodside*, 396 F.3d 730, 736 (6th Cir. 2004).

101. "Although property rights are principally created by state law, whether a substantive interest created by the state rises to the level of a constitutionally protected property interest is a question of federal constitutional law... The due process clause only protects those interests to which one has a legitimate claim of entitlement." *Waeschle v Dragovic*, 576 F.3d 539, 544-545 (6th Cir. 2009).

102. Pursuant to the clear and unambiguous language of Mich. Const. 1963, art. 9, § 23, Plaintiff has a protected property interest and is "entitled" to publicly inspect the audit reports that were required to be conducted on

the Highland Park School District's Sinking Fund in accordance with Mich.

Comp. Laws § 380.1212(1) of the Revised School Code.

103.     Defendant Emergency Manager's failure to comply with the

requirements of Mich. Comp. Laws § 380.1212(1) of the Revised School

Code constitutes a violation of Plaintiff Davis' procedural due process rights

under the Fourteenth Amendment.

## COUNT IV

**State-Law Claim- Declaratory Judgment Declaring Mich. Comp. Laws §
380.1212(1) Requires Defendant Emergency Manager To Have An
Independent Audit Conducted For Each Fiscal Year That A Tax Is Levied
For A Sinking Fund In The Highland Park School District.**

104.     Plaintiff incorporates, repeats, and realleges the foregoing allegations

as though they were fully set forth and stated herein.

105.     This claim is brought pursuant to the Declaratory Judgment Act.

Plaintiff respectfully requests the Court to exercise its supplemental

jurisdiction in accordance with 28 U.S.C. § 1367 over this state-law claim.

106.     This claim seeks prospective declaratory relief against Defendant

Emergency Manager, in his official capacity.

107.     On June 3, 2016, Plaintiff Davis sent, via electronic mail, a request to

the Defendant Emergency Manager requesting a copy of the audit reports for

the Highland Park School District's Sinking Fund for the fiscal years of

2012-2013, 2013-2014, 2014-2015 in accordance with Mich. Const. 1963, art. 9, § 23. **(See Plaintiff's June 3, 2016 Email to Defendant Emergency Manager attached hereto as Exhibit I)**.

108.     On June 27, 2016, through his FOIA Coordinator, the Defendant Emergency Manager issued a response to Plaintiff Davis' June 3, 2016 written request, and informed Plaintiff Davis that the Sinking Fund was not audited for the 2012-2013, 2013-2014, and 2014-2015 fiscal years and thus, no copies of any audit reports existed. **(See Defendant Emergency Manager's June 27, 2016 written response to Plaintiff attached hereto as Exhibit J)**.

109.     Pursuant to Mich. Comp. Laws § 380.1212(1) of the Revised School Code, Defendant Emergency Manager was required to have an independent audit done for each fiscal year that a tax was levied for a sinking fund for the Highland Park School District.

110.     Mich. Comp. Laws § 380.1212(1) of the Revised School Code states in pertinent part:

> **"A school district that levies a sinking fund tax under this section shall have an independent audit of its sinking fund conducted annually, including a review of the uses of the sinking fund, and shall submit the audit report to the department of treasury.** If the department of treasury determines from the audit report that the sinking fund has been used for a purpose other than those authorized for the sinking fund under this section, the school district shall repay

the misused funds to the sinking fund from the school district's operating funds and shall not levy a sinking fund tax under this section after the date the department of treasury makes that determination." (Emphasis supplied).

111.    Admittedly, the Defendant Emergency Manager has failed to comply with and adhere to the provisions of Mich. Comp. Laws § 380.1212(1) of the Revised School Code. **(See Defendant Emergency Manager's June 27, 2016 written response to Plaintiff attached hereto as Exhibit J)**.

112.    Under the rules of statutory construction, "where the statutory language is unambiguous, the plain meaning reflects the Legislature's intent and the statute must be applied as written." *Danse Corp. v. City of Madison Heights*, 466 Mich. 175, 182 (2002).

113.    The language of Mich. Comp. Laws § 380.1212(1) being clear and unambiguous, under Michigan precedent, must be enforced as written. *Danse Corp, supra.* As the Michigan Supreme Court explained in *Roberts v Mecosta Co. General Hosp.,* 466 Mich. 57, 642 NW2d 663, 667 (2002):

> "An anchoring rule of jurisprudence, and the foremost rule of statutory construction, is that courts are to effect the intent of the Legislature. To do'so, we begin with an examination of the language of the statute. If the statute's language is clear and unambiguous, then we assume that the Legislature intended its plain meaning and the statute is enforced as written. A necessary corollary of these principles is that a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself. (Internal citations omitted)."

Page 33 of 38

114.    As the Court is undoubtedly aware, "[a] federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v U.S. Trotting Ass'n,* 174 F.3d 733, 741 (6th Cir. 1999).

115.    Thus, in accordance with the Michigan Supreme Court's holding in *Roberts, supra,* this Court must apply the clear and unambiguous language of Mich. Comp. Laws § 380.1212(1) as written to the undisputed facts of this case for "[a] clear and unambiguous statute requires full compliance with its provisions as written." *Roberts v Mecosta Co. General Hosp.,* 642 NW2d at 669.

116.    Accordingly, a declaratory judgment is required declaring that the Defendant Emergency must have an independent audit conducted for each fiscal year that a tax was levied in the Highland Park School district for the purpose of establishing a sinking fund in accordance with Mich. Comp. Laws § 380.1212(1) of the Revised School Code.

## COUNT V

**Defendants Emergency Manager and Arwood, In Their Respective Official Capacities, Shall Be Preliminarily and Permanently Enjoined from Enforcing The Defendant Emergency Manager's February 24, 2016 Order and Escrow Agreement.**

117. Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

118. This claim is brought pursuant to 42 U.S.C. § 1983, and the Declaratory Judgment Act.

119. This clam seeks prospective injunctive relief against Defendants Emergency Manager and Arwood, in their respective official capacities.

120. Plaintiff Davis seeks to enjoin, preliminarily and permanently, Defendants Emergency Manager and Arwood, in their respective official capacities, from enforcing the Defendant Emergency Manager's February 24, 2016 Order and Escrow Agreement.

121. With each passing day Defendants are permitted to expend funds from the Highland Park School District's Sinking Fund for an impermissible purpose without first obtaining approval from the Plaintiff and other registered electors of the City of Highland Park, Plaintiff Davis is being denied the right to exercise his fundamental right to vote and thus, is being

irreparably harmed. **(See Plaintiff's affidavit attached hereto as Exhibit A).**

## COUNT VI
**Plaintiff Shall Be Awarded Compensatory, Punitive and Nominal Damages.**

122.    Plaintiff incorporates, repeats, and realleges the foregoing allegations as though they were fully set forth and stated herein.

123.    This claim seeks an award of compensatory, punitive and nominal damages against the Defendants Emergency Manager and Arwood, in their individual capacities, for violating Plaintiff Davis' Constitutional Rights.

124.    If the Court determines and declares that the Defendants, individually and/or collectively, violated Plaintiff Davis' Constitutional Rights, Plaintiff respectfully requests the Court to award compensatory, punitive and nominal damages against the Defendants, in their individual capacities, for violating Plaintiff Davis' Constitutional Rights.

125.    Plaintiff Davis seeks an award of damages in excess of $15,000.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Davis PRAYS that this Honorable Court GRANT the requested relief and enters Judgment against Defendants providing for:

A. Declaratory Judgment declaring that Defendants violated Plaintiff Davis' fundamental right to vote by failing to get approval of a majority of the

registered and qualified electors of the City of Highland Park prior to using funds from the Highland Park School District's Sinking Fund to pay for the costs associated with the demolition of Highland Park Community High School.

B. Declaratory Judgment declaring that Defendants violated Plaintiff Davis' substantive due process rights by failing to get approval of a majority of the registered and qualified electors of the City of Highland Park prior to using funds from the Highland Park School District's Sinking Fund to pay for the costs associated with the demolition of the Highland Park Community High School.

C. Declaratory Judgment declaring that Defendant Emergency Manager violated Mich. Comp. Laws 380.1212 by failing to have an independent audit performed on the Highland Park School District's Sinking Fund for each year that a millage was levied.

D. Declaratory Judgment declaring that Defendant Emergency Manager violated Plaintiff Davis' procedural due process rights by failing to provide Plaintiff Davis with copies of the independent audit reports that were required to conducted on the Highland Park School District's Sinking Fund.

E. Issue an injunction enjoining the Defendants from enforcing the Escrow Agreement and the Defendant Emergency Manager's February 24, 2016

Order authorizing the use of funds from the Highland Park School District's

Sinking Fund to pay for the costs associated with the demolition of the

Highland Park Community High School.

F. Award Plaintiff Davis compensatory, punitive and nominal damages in excess of $15,000 against Defendants, in their respective his individual capacities, for violating Plaintiff Davis' constitutional rights.

G. Grant and Order such further relief as the Court deems just and equitable.

**Dated:** July 22, 2016

Respectfully submitted,

/s/ ROBERT DAVIS

ROBERT DAVIS, *Pro se*
Plaintiff
180 Eason
Highland Park, MI 48203
(313) 523-7118

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ROBERT DAVIS,**
        Plaintiff,

**Case No. 16-cv-**
**HON.**

v

**STEVEN M. SCHILLER,** in his official and individual capacities as the duly appointed Emergency Manager for the Highland Park School District Under Public Act 436 of 2012, **and STEVE ARWOOD,** in his official and individual capacities as Director of the Department of Talent and Economic Development,
        Defendants,

_____/

ROBERT DAVIS
*Pro Se Plaintiff*
180 Eason
Highland Park, MI 48203
(313) 523-7118
Davisrobert854@gmail.com

_____/

## AFFIDAVIT OF ROBERT DAVIS

**NOW COMES ROBERT DAVIS,** a natural person, being first duly sworn and deposed, and under the penalty of perjury states the following:

1.  That I am the plaintiff in the above-captioned matter.

2.  That I served as a duly elected member of the Highland Park Board of Education from 2002-2014.  I served in the capacities of President, Vice President, and Secretary.

3. That I have been a registered and qualified elector of the City of Highland Park since November 1997. Currently, I am a resident and registered elector of the City of Highland Park.

4. On December 30, 2015, Defendant Arwood, on behalf of the Michigan Land Bank Fast Track Authority, submitted an application to the Michigan State Housing Development Authority seeking a grant of $2 million to demolish the Highland Park Community High School. Although Defendant Arwood's application only sought a grant of $2 million, the application revealed that the total demolition project to demolish Highland Park Community High School would cost approximately $2.4 million.

5. The grant application submitted by Defendant Arwood further revealed that the demolition project to demolish Highland Park Community High School would require a $400,000 contribution from the Highland Park School District's Sinking Fund.

6. On February 9, 2016, on behalf of the Michigan Land Bank Fast Track Authority, Defendant Arwood executed a "Site Access and Demolition Agreement" with the former Mayor of the City of Highland Park, DeAndre Windom, and the former Emergency Manager for the Highland Park School District, Donald Weatherspoon, to demolish the Highland Park Community High School, located at 15900 Woodward Ave.

7. The Highland Park Community High School's structure is owned by the Highland Park School District and the land on which it was constructed is owned by the City of Highland Park.

8. On February 24, 2016, the Defendant Emergency Manager and Defendant Arwood entered into an agreement to create an "Escrow Account" for the purpose of transferring $500,000 from the Highland Park School District's Sinking Fund to cover costs of the demolition of the Highland Park Community High School.

9. In fact, in accordance with Public Act 436, on that same day, February 24, 2016, the Defendant Emergency Manager also issued an order authorizing the use of funds from the Highland Park School District's Sinking Fund to be used to pay for the demolition costs of the Highland Park Community High School.

10. On April 13, 2016, in accordance with the executed Escrow Agreement and the February 24, 2016 Order, the Defendant Emergency Manager authorized the electronic transfer of $500,000 from the Highland Park School District's Sinking Fund to the newly created Escrow Fund for the purpose of covering the costs of the demolition of the Highland Park Community High School.

11. On June 3, 2016, I sent, via electronic mail, a request to the Defendant Emergency Manager requesting a copy of the audit reports for the Highland

Park School District's Sinking Fund for the fiscal years of 2012-2013, 2013-2014, 2014-2015 in accordance with Mich. Const. 1963, art. 9, § 23.

12. On June 27, 2016, through his FOIA Coordinator, the Defendant Emergency Manager issued me a response to my June 3, 2016 written request, and informed me that the Sinking Fund was not audited for the 2012-2013, 2013-2014, and 2014-2015 fiscal years and thus, no copies of any audit reports existed.

13. On June 16, 2016, I sent, via electronic mail, a request to the Michigan Land Bank Fast Track Authority seeking documents pertaining to the demolition of the Highland Park Community High School.

14. On July 8, 2016, through its legal counsel Patrick Ennis, the Michigan Land Bank Fast Track Authority responded to my June 16, 2016 request for documents and provided me, free of charge, with copies of various contacts and agreements entered into with the Defendant Emergency Manager.

15. The Defendant Emergency Manager unlawfully authorized the use of funds from the Highland Park School District's Sinking Fund for an impermissible purpose without first obtaining the approval from the majority of electors from the City of Highland Park.

16. Moreover, and perhaps more importantly, the Revised School Code, being Mich. Comp. Laws § 380.1212, does not permit the use of funds from the

Highland Park School District's Sinking Fund to be used for the purpose of demolishing a school structure when it's not for the purpose of building or improving a new or existing school facility.

17. As noted in the Defendant Emergency Manager's February 24, 2016 Order, the predecessor to the Defendant Emergency Manager, on behalf of the Highland Park School District, entered into an amendment to the Reciprocal Lease Agreement on March 30, 2015 with the City of Highland Park wherein the Highland Park School District agreed to convey back to the City of Highland Park for valuable consideration its interest in the land leases for the Highland Park High School. The conveyance was contingent upon funding becoming available from the Michigan State Housing Development Authority to pay for the costs of the demolition and removal of the Highland Park Community High School.

18. Funds from the Highland Park School District's Sinking Fund can only be used for specific purposes. Mich. Comp. Laws § 380.1212 of the Revised School Code governs local school district's sinking funds. Mich. Comp. Laws § 380.1212(1) states in pertinent part:

> "(1) If approved by the school electors of the school district, the board of a school district may levy a tax of not to exceed 5 mills on the state equalized valuation of the school district each year for a period of not to exceed 20 years, **for the purpose of creating a sinking fund to be used for the purchase of real estate for sites for,**

**and the construction or repair of, school buildings**." (Emphasis supplied).

19. It is evident that the demolition of the Highland Park Community High School does not fall within the listed purposes for which funds from a sinking fund can be used for. As noted above, Mich. Comp. Laws § 380.1212(1) of the Revised School Code clearly and unambiguously limits the purposes for which funds from a sinking fund can be used. Demolishing a school building on land owned by the local municipality, is not among the approved purposes, especially considering the demolition of the Highland Park Community High School is not for a school-related project. It is believed that the City of Highland Park wants the Highland Park Community High School demolished and removed from the land because the City of Highland Park intends to develop the land for commercial use.

20. Thus, in order for funds from the Highland Park School District's Sinking Fund to be used for a purpose other than that for which it was raised, the Defendants needed to secure and obtain "the consent of a majority of the school electors of the district voting on the question at a regular or special school election." See Mich. Comp. Laws § 380.1216 of the Revised School Code.

21. To date, a majority of the electors of the City of Highland Park, at a regular or special school election, have not approved the use of Sinking Funds to

pay for the costs of the demolition of the Highland Park Community High School.

22. As a duly registered and qualified elector of the City of Highland Park, I desire to exercise his fundamental constitutional right to vote to vote against using any funds from the Highland Park School District's Sinking Fund to pay for the costs of demolishing and removing the Highland Park Community High School.

23. I have contacted representatives from the Wayne County Prosecutor's Office and Michigan Attorney General's Office with respect to the Defendant Emergency Manager and Defendant Arwood's unlawful and illegal actions pertaining to the unlawful use of funds from the Highland Park School District's Sinking Fund.

24. That I have suffered irreparable harm as a result of not being able to vote on the question of whether to use funds from the Highland Park School District's Sinking Fund to pay for costs associated with the demolition of Highland Park Community High School.

25. That the Defendants, individually and collectively, have violated my Constitutional Rights.

26. That prior to filing the instant lawsuit, I forewarned the Defendant Emergency Manager and representatives from the Michigan Land Bank Fast

Track Authority and other state officials that the use of funds from the Highland Park School District's Sinking Fund for this purpose was unlawful and in violation of the Revised School Code.

27. That all of the allegations contained in each of the numbered paragraphs in the attached Verified Complaint and Emergency Motion for TRO/Preliminary Injunction are true and correct.

28. That if called as a witness, I am competent to testify as to the facts stated, contained, and alleged herein.

**FURTHER AFFIANT SAYETH NOT.**

_____
**ROBERT DAVIS**


Subscribed and sworn to before me

On this 22ⁿᵈ _____ day of July, 2016.

_____
NOTARY PUBLIC

My Commission Expires: _____ 1-19-2020 _____

CHARLENE L THOMPSON
Notary Public - Michigan
Oakland County
My Commission Expires Jan 19, 2020
Acting in the County of _Oakland_

# EXHIBIT B

89 (Rev. 04-15)



**STATE OF MICHIGAN**
**DEPARTMENT OF TREASURY**
LANSING

RICK SNYDER
GOVERNOR

NICK A. KHOURI
STATE TREASURER

## CONTRACT FOR EMERGENCY MANAGER SERVICES

Rick Snyder, Governor of the State of Michigan (Governor) and the Michigan Department of Treasury retain and appoint Steven Michael Schiller as the Emergency Manager (Emergency Manager) for the Highland Park School District (School District) under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq*, (the Act).

The Emergency Manager will provide services to the School District pursuant to the terms and conditions set forth in this Contract and the Act.

The Emergency Manager's role is to remedy the financial distress of the School District by requiring, within available resources, prudent fiscal management and an efficient provision of services by exercising the necessary authority conferred herein to take appropriate action on behalf of the School District and its students. In accepting this appointment, the Emergency Manager agrees to leverage all the Emergency Manager's skills and abilities to accomplish these objectives on behalf of School District students.

## 1. PARTIES, PURPOSE, DUTIES, AND REPORTS

1.1 Parties. The parties to this Contract are the State of Michigan by the Department of Treasury and Steven Michael Schiller.

1.2 Purpose. The parties to this Contract agree that Steven Michael Schiller will act as the Emergency Manager for the School District. The Emergency Manager's duties and responsibilities are delineated in the Act and include conducting all aspects of the operations of the School District and establishing and implementing a written financial plan as required by Section 11 of the Act.

1.3 Duties. The Emergency Manager shall possess all the powers and duties authorized under the Act, including those specifically related to local governments. In addition, the Emergency Manager shall work cooperatively with the Office of the Governor and the State Treasurer. The Emergency Manager agrees to continue to keep these officials informed of major initiatives to be undertaken in furtherance of this Contract before their public announcement. The Emergency Manager shall seek the approval of the State Treasurer before entering into a new collective bargaining agreement.

1.4 Reports. The Emergency Manager shall file quarterly reports with the Department of Treasury beginning on April 15, 2016, for the immediately preceding quarter and shall file the first report required by Section 17 of the Act within six months of the Emergency Manager's appointment and every three months thereafter.

1.5 Communications. The Emergency Manager shall establish and maintain an appropriate protocol for ongoing communications with officials of the School District, School District residents, and the media. The communications protocol should include a variety of means, including personal interactions.

## 2. TERM OF CONTRACT

2.1 The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act.

2.2 Effective Date. This contract is effective on Monday February 22, 2016.

## 3. COMPENSATION FOR SERVICES PROVIDED

3.1 Source of Payment. The State shall pay the compensation of the Emergency Manager for all services rendered under this Contract.

3.2 Salary. The Emergency Manager's salary for services rendered under this Contract shall be $90,000.00 per year. If this Contract is terminated after the Emergency Manager has provided services for a portion of a month, the Emergency Manager shall be entitled, for that portion of that month, to $7,500.00 multiplied by the proportion that the number of days of the month for which services were provided bears to the number of days of the whole month. The Emergency Manager shall not receive or accept any compensation from the School District or the State except as provided for in this contract.

3.3 Payment for Services. The Emergency Manager shall be paid in installments consistent with the established written policies and procedures of the Michigan Department of Treasury. If requested by the State Treasurer, the Emergency Manager shall provide to the Michigan Department of Treasury additional information regarding services performed pursuant to this Contract.

3.4 Reimbursement for Actual and Necessary Expenses. The actual and necessary expenses of the Emergency Manager, including customary expenses related to travel, meals, and lodging which are incurred in connection with service to the School District will be reimbursed by the School District. The Emergency Manager shall provide original copies of all receipts for meals, lodging, and travel reimbursement with any request for reimbursement. Any reimbursement for expenses under this contract shall be reviewed and approved in writing by the School District's Chief Financial Officer.

## 4. ADDITIONAL STAFF AND CONSULTANT FEES

4.1 Staff. The Emergency Manager may, as provided in the Act, appoint additional staff as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional staff will be the obligation of the School District. While authority to hire additional staff rests with the Emergency Manager, the Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least

2

24 hours before extending offers of employment for positions paying $50,000.00, or more, annually. The Emergency Manager shall issue a written employment contract to each individual hired pursuant to this Section, regardless of the compensation paid to that individual. The employment contract issued pursuant to this Section shall, as of the date the individual is hired by the Emergency Manager, prohibit the individual from engaging in any other employment for remuneration without the express written approval of the Emergency Manager. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before approving outside employment for any individual. A breach of this Section shall be a material breach of this Contract.

4.2 Professional Assistance. The Emergency Manager may, as provided in the Act, secure professional assistance as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional professional assistance will be the obligation of the School District. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before authorizing professional services contracts of $50,000.00, or more, per engagement or project. If a contract under this Section, or under Section 4.1, has a value of $50,000 or more, the Emergency Manager shall not execute the contract unless the contract is subject to competitive bidding by the Emergency Manager or the Emergency Manager receives prior written approval from the State Treasurer.

4.3 Security. The Emergency Manager will be entitled to receive security protection in connection with the Emergency Manager's duties under this Contract. Security personnel will be retained only upon the approval of the State Treasurer, or the designee of the State Treasurer, and only after consultation with the Director of the Michigan Department of State Police, or the designee of the Director of the Michigan Department of State Police. Payment of compensation for security personnel will be the obligation of the School District.

## 5. REPRESENTATIONS

5.1 Qualifications. By signing this Contract, the Emergency Manager, represents that the Emergency Manager meets the minimum qualifications for appointment set forth in the Act. The Emergency Manager shall perform the duties of that office on a full-time basis, except as otherwise approved by the State Treasurer, and shall not accept any other employment or engage in any other activity for remuneration without the express written approval of the State Treasurer.

5.2 Conflict of Interest. The Emergency Manager represents and warrants that the Emergency Manager has no personal or financial interest, and will not acquire any such interest, that would conflict in any manner or degree with the performance of this Contract.

5.3 Non-competition. The Emergency Manager represents and warrants that the Emergency Manager is not subject to any non-disclosure, non-competition, or similar clause with current or prior clients or employers that will interfere with the performance of this Contract. The State will not be subject to any liability for any such claim.

5.4 Facilities and Personnel. The School District will provide the Emergency Manager with

3

proper facilities and personnel to perform the services and work required to be performed pursuant to this Contract.

5.5 Records. The Emergency Manager shall maintain complete records in accordance with generally accepted accounting practices and sound business practices. This requirement applies to all information maintained or stored in the computer system of the Emergency Manager or computer system of the School District. The State Treasurer and his designees shall have the right to inspect all records related to this Contract.

5.6 Non-Discrimination.

a) The Emergency Manager shall comply with Public Act 220 of 1976, the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*, and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against any employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

b) The Emergency Manager shall comply with Public Act 453 of 1976, the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*, and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

5.7 Unfair Labor Practices. The Emergency Manager shall not enter into a contract for the performance of any obligation imposed by this Contract with a subcontractor, manufacturer, or supplier whose name appears in the register prepared pursuant to Public Act 278 of 1980, MCL 423.322, of employers found in contempt of court for failure to correct unfair labor practices. The State may void this Contract if the Emergency Manager, or any subcontractor, manufacturer, or supplier of the Emergency Manager that is a party to a contract for the performance of any obligation imposed by this Contract, appears in the above mentioned register.

5.8 Independent Contractor. The relationship of the Emergency Manager to the State and to the School District under this Contract is that of an independent contractor. Except as specifically provided in the Act, no liability, benefits, workers compensation rights or liabilities, insurance rights or liabilities, or any other rights or liabilities arising out of, or related to, a contract for hire, nor employer-employee relationship, shall arise, accrue, or be implied to either party under this Contract or to an agent, subcontractor, or employee of either party under this Contract, as a

4

result of the performance of this Contract.

## 6. NOTICES

6.1 The State Treasurer is the designee for this Contract unless notice of another designation is provided by the Governor. All notices, correspondence, requests, inquiries, billing statements, and other documents mentioned in this Contract shall be directed to the attention of the State Treasurer, N.A. Khouri, and to the following:

For the State:

Michigan Department of Treasury
Office of Legal Affairs
Richard H. Austin Building, 430 West Allegan Street
Lansing, Michigan 48922
Phone: (517) 373-3223

For the Emergency Manager:

Steven Michael Schiller
Administration Building
15900 Woodward Avenue, Suite 212
Highland Park, MI 48203

## 7. LIMITATION UPON LIABILITY

7.1 The State. The State, the Governor, the State Treasurer, and all other State officials are not liable for any obligation of or claim against the School District resulting from actions taken in accordance with the Act or this Contract.

7.2 The Emergency Manager. Pursuant to the Act, in performing this Contract the Emergency Manager is engaging in a governmental function and is immune from liability for any action taken which the Emergency Manager reasonably believes to be within the scope of the Emergency Manager's authority granted by the Act or by this Contract.

## 8. INSURANCE

8.1 General. The Emergency Manager may procure and maintain, at the expense of the School District, health, worker's compensation, general liability, professional liability, and motor vehicle insurance for the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager as may be provided to elected officials, appointed officials, or employees of the School District. The insurance procured and maintained by the Emergency Manager may extend to any claim, demand, or lawsuit asserted or costs recovered against the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager to the extent permitted by the Act.

8.2 Post-Contract. If, after the date that the service of the Emergency Manager is con-

5

cluded, the Emergency Manager or any employee, agent, appointee, or contractor of the Emergency Manager is subject to a claim, demand, or lawsuit arising from an action taken during the service of the Emergency Manager, and not covered by a procured insurance policy, litigation expenses, including but not limited to attorney fees, payments in satisfaction of judgments, and payments made in settlement as specified pursuant to the Act, shall be paid by the School District. If such expenses are not paid by the School District, they shall be treated as a debt owed to this State pursuant to section 17a(5) of Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act of 1971, MCL 141.917a.

8.3 <u>Additional Insurance</u>. If the School District has purchased, or otherwise obtained, an errors and omissions policy, then the Emergency Manager may choose to be covered under such policy at the expense of the School District.

8.4 <u>Payment by School District</u>. All insurance required under this Contract shall be acquired at the expense of the School District under valid and enforceable policies, issued by insurers of recognized responsibility. The State Treasurer reserves the right to reject as unacceptable any insurer.

## 9. TERMINATION OF CONTRACT AND APPOINTMENT

9.1 <u>Termination by the State</u>.

a) <u>The State</u>. The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act. The Governor has the power to rescind the appointment and terminate this Contract at any time, and without cause, by issuing a Notice of Termination to the Emergency Manager.

9.2 <u>Termination Process</u>. Upon receipt of a Notice of Termination, and except as otherwise directed, the Emergency Manager shall:

a) Cease work under this Contract upon the date and to the extent specified in the Notice of Termination;

b) Incur no costs beyond the date specified by the Notice of Termination;

c) Submit to the State Treasurer on the date the termination is effective all records, reports and documents as this State shall specify and carry out such directives as the State Treasurer may issue concerning the safeguarding and disposition of files and property; and

d) Submit within 30 calendar days a closing memorandum and final billing, which shall be paid within 30 days.

9.3 <u>Termination by Emergency Manager</u>. The Emergency Manager may terminate this Contract at any time, with or without cause, with 30 days written notice to the State Treasurer. Within 30 days of the Emergency Manager's final day of service, the Emergency Manager shall submit a closing memorandum and final billing, which shall be paid within 30 calendar days.

6

## 10. GENERAL PROVISIONS

10.1 Governing Law and Jurisdiction. This Contract shall be subject to, and construed according to, the laws of the State of Michigan, and no action shall be commenced against this State, its agents, or employees for any matter whatsoever arising out of this Contract, in any court other than a Michigan State court.

10.2 No Waiver. A party's failure to insist on the strict performance of this Contract shall not constitute waiver of any breach of the Contract.

10.3 Other Debts. The Emergency Manager represents and warrants that the Emergency Manager is not, and will not become, in arrears on any contract, debt, or other obligation to the State of Michigan, including taxes.

10.4 Invalidity. If any provision of this Contract or its application to any persons or circumstances shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Contract shall not be affected, and each remaining provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

10.5 Headings. Section headings contained in this Contract are for convenience only and shall not be used to interpret the scope or intent of this Contract.

10.6 Entire Agreement. This Contract represents the entire and exclusive agreement between the parties and supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties.

10.7 Amendment. No Contract amendment will be effective and binding upon the parties to this Contract unless the amendment expressly makes reference to this Contract, is in writing, and is signed by duly authorized representatives of all parties and all the requisite State approvals are obtained.

10.8 Order of Priority. This Contract and the Act shall be read to be consistent one with the other. However, if a conflict is deemed to exist between the terms of this Contract and the Act, the Act shall supersede the terms of this Contract.

10.9 Counterparts. This Contract may be executed in separate counterparts, each of which when executed shall be deemed an original, but all of which when taken together shall constitute one and the same Contract.

IN WITNESS WHEREOF, the Governor and the Emergency Manager have signed and executed this Contract.

STATE OF MICHIGAN

Dated: _____

Rick Snyder, Governor

Dated: ___2/22/16_____

Steven Michael Schiller, Emergency Manager

Approved as to form and content pursuant to Section 9(3)(e) of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq.*

Dated: _____

N.A. Khouri, State treasurer

8

# EXHIBIT C



STATE OF MICHIGAN
EXECUTIVE OFFICE
LANSING

RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

## EXECUTIVE ORDER
## No. 2014 - 12

### CREATION OF THE
### DEPARTMENT OF TALENT AND ECONOMIC DEVELOPMENT
### AND MICHIGAN TALENT INVESTMENT AGENCY

### DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
### DEPARTMENT OF TREASURY
### MICHIGAN STRATEGIC FUND
### MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY
### STATE LAND BANK FAST TRACK AUTHORITY
### OFFICE FOR NEW AMERICANS

### EXECUTIVE REORGANIZATION

WHEREAS, Section 1 of Article V of the Michigan Constitution of 1963 vests the executive power of the state of Michigan in the Governor; and

WHEREAS, Section 2 of Article V of the Michigan Constitution of 1963 empowers the Governor to make changes in the organization of the Executive Branch or in the assignment of functions among its units that he considers necessary for efficient administration; and

WHEREAS, Section 8 of Article V of the Michigan Constitution of 1963 provides that each principal department shall be under the supervision of the Governor unless otherwise provided by the Constitution; and

WHEREAS, there is a continued need to reorganize functions among state departments to ensure efficient administration; and

WHEREAS, skilled talent availability is critical to the continued growth of the Michigan economy; and

WHEREAS, strategies for spurring economic development and securing meaningful and rewarding employment for Michigan residents are interdependent;

NOW, THEREFORE, I, Richard D. Snyder, Governor of the state of Michigan, by virtue of the powers and authority vested in the Governor by the Michigan Constitution of 1963 and Michigan law, order the following:

## I.    DEFINITIONS

As used in this Order:

A.    "Department of Talent and Economic Development" or "Department" means the principal department of state government created under Section II of this Order.

B.    "Department of Licensing and Regulatory Affairs" means the principal department of state government created as the Department of Commerce under Section 225 of the Executive Organization Act of 1965, 1965 PA 380, MCL 16.325, renamed the Department of Consumer and Industry Services under Executive Order 1996-2, MCL 445.2001, renamed the Department of Labor and Economic Growth under Executive Order 2003-18, MCL 445.2011, renamed the Department of Energy, Labor, and Economic Growth under Executive Order 2008-20, MCL 445.2025, and renamed the Department of Licensing and Regulatory Affairs under Executive Order 2011-4, MCL 445.2030.

C.    "Department of Treasury" means the principal department of state government created under Section 75 of the Executive Organization Act of 1965, 1965 PA 380, MCL 16.175.

D.    "Michigan Economic Development Corporation" means the public body corporate created under the Urban Cooperation Act of 1967, 1967 (Ex Sess) PA 7, MCL 124.501 to 124.512, by a contractual interlocal agreement effective April 5, 1999, as amended, between the Michigan Strategic Fund and local participating economic development corporations formed under the Economic Development Corporations Act, 1974 PA 338, MCL 125.1601 to 125.1636.

E.    "Michigan State Housing Development Authority" means the public body corporate and politic created under Section 21 of the State Housing Development Authority Act of 1966, 1966 PA 346, MCL 125.1421.

F.    "Michigan Strategic Fund" means the public body corporate and politic created under Section 5 of 1984 PA 270, MCL 125.2005.

G.    "State Budget Director" means the individual appointed by the Governor pursuant to Section 321 of The Management and Budget Act, 1984 PA 431, MCL 18.1321.

## II.   CREATION OF DEPARTMENT OF TALENT AND ECONOMIC DEVELOPMENT

A.   The Department of Talent and Economic Development is created as a principal department of state government.  The Department shall exercise the powers, duties, functions, and responsibilities vested in the Department under this Order and develop, administer, and coordinate state economic, housing, and talent development initiatives and programs.

B.   The Director of the Department shall be the head of the Department and shall be appointed by the Governor by and with the advice and consent of the Michigan Senate and serve at the pleasure of the Governor, consistent with Section 3 of Article V of the Michigan Constitution of 1963.  The Director shall serve as a member of the Governor's Cabinet.  In addition to other powers, duties, functions, and responsibilities vested in the Director of the Department under this Order and Michigan law, the Director also may serve as the Chief Executive Officer of the Michigan Economic Development Corporation if appointed as Chief Executive Officer of the Michigan Economic Development Corporation by its Executive Committee.

C.   The Director of the Department may delegate a power, duty, function, or responsibility conferred upon the Director of the Department by this Order or Michigan law to a person within the Department.  The person to whom the power, duty, function, or responsibility is delegated may perform or exercise the power, duty, function, or responsibility at the time and to the extent that the power, duty, function, or responsibility is delegated by the Director of the Department.

D.   The Director of the Department shall provide executive direction and supervision for the implementation of all transfers to the Department or the Director of the Department under this Order.

E.   The Director of the Department shall administer the powers, duties, functions, and responsibilities transferred to the Department or the Director of the Department by this Order in such ways as to promote efficient administration and shall make internal organizational changes within the Department as the Director deems administratively necessary to complete the realignment of responsibilities under this Order.

F.   Except as otherwise provided in this Order, all records, property, and unexpended balances of appropriations, allocations, or other funds used, held, employed, or to be made available for powers, duties, functions, and responsibilities transferred to the Department or the Director of the Department under this Order are transferred to the Department.

## III.   CREATION OF MICHIGAN TALENT INVESTMENT AGENCY

A.   The Michigan Talent Investment Agency is created within the Department. The Michigan Talent Investment Agency shall exercise the powers, duties, functions,

3

and responsibilities vested in the Michigan Talent Investment Agency under this Order or assigned to the Michigan Talent Investment Agency by the Director of the Department under the direction and supervision of the Director of the Department. The Governor shall appoint the head of the Michigan Talent Investment Agency, who is designated as a member of the Governor's Cabinet.

B.     In addition to any other powers, duties, functions, and responsibilities vested in the Michigan Talent Investment Agency, the Michigan Talent Investment Agency shall exercise all of the following powers, duties, functions, and responsibilities:

i.     Review, investigate, evaluate, and assess all programs within the executive branch of government related to talent services and programs, including, but not limited to, services and programs involving job preparedness, career-based education, skilled trades training, incumbent worker training, employment assistance, STEM training programs, and programs targeted at the structurally unemployed.

ii.     Analyze and make recommendations to the Director of the Department and the Governor on existing and proposed talent services, programs, and policies, and on the elimination of duplication in existing state programs in these areas.

iii.     Provide information and assistance relating to talent services and programs to state departments and agencies, both directly and by functioning as a clearinghouse for information related to talent services and programs received from the state departments and agencies, other government agencies in this state, other states, the federal government, and job creators.

iv.     Serve as the Governor's liaison to state departments and agencies and the workforce regions of this state with respect to talent services and programs.

v.     Request advice and assistance from state departments and agencies relating to the reengineering of business processes relating to talent services and programs and establish inter-agency and intra-agency data sharing requirements, policies, procedures, and standards to improve services for job seekers and job providers in Michigan relating to talent services and programs. State departments and agencies shall cooperate fully with the Michigan Talent Investment Agency in the performance of its powers, duties, functions, and responsibilities.

vi.     Unless contrary to state or federal law, serve as the coordinating office for state departments and agencies with talent services responsibilities including, but not limited to, Michigan Rehabilitation Services in the Department of Human Services, the Michigan Veterans

4

Affairs Agency in the Department of Military and Veterans Affairs, the Bureau of Services for Blind Persons in the Department of Licensing and Regulatory Affairs, and the Prisoner Reentry Program and Community Support Services Program administered by the Department of Corrections.  Coordinating functions include, but not limited to, combined state plans, development of performance metrics, identification of high demand jobs by prosperity regions, and employer outreach.

vii.     Function as the clearinghouse for all communications with the United States Department of Labor relating to talent services and programs.

viii.    To the extent permitted under applicable law, coordinate talent services and program funding opportunities on a state and regional basis, including, but not limited to, the workforce regions within this state.

## IV.   OTHER TRANSFERS TO TALENT INVESTMENT AGENCY

A.     All of the powers, duties, functions, and responsibilities of the Workforce Development Agency created by Section VIII of Executive Order 2011-4, MCL 445.2030, including all records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and procurement, are transferred from the Michigan Strategic Fund to the Michigan Talent Investment Agency.

B.     The Governor's Talent Investment Board created by Executive Order 2011-13 is transferred from the Michigan Strategic Fund to the Michigan Talent Investment Agency.  The Governor's Talent Investment Board shall function as an advisory body and shall continue to be the state workforce investment board required for this state under Section 111 of the federal Workforce Investment Act of 1998 and, as of July 1, 2015, the Workforce Innovation and Opportunity Act.  The position on the Governor's Talent Investment Board held by the Director of the Department of Licensing and Regulatory Affairs is transferred to the Director of the Department, or his or her designee from within the Department.

C.     All of the powers, duties, functions, and responsibilities of the Unemployment Insurance Agency created by Section II.N. of Executive Order 2003-14, MCL 445.2011, including, but not limited to, the powers, duties, functions, and responsibilities of the Director of the former Unemployment Insurance Agency under Section 5 of the Michigan Employment Security Act, 1936 (Ex Sess) PA 1, MCL 421.5, defined as the Director of Employment Security in Executive Order 1997-12, MCL 421.94, transferred to the Director of the Bureau of Worker's and Unemployment Compensation under Executive Order 2002-1, MCL 445.2004, and transferred to the Department of Licensing and Regulatory Affairs by Executive Order 2011-4, MCL 445.2030, including all records, personnel, property, unexpended balances of appropriations, allocations or other funds, including the functions of budgeting and

procurement, are transferred from the Department of Licensing and Regulatory Affairs to the Michigan Talent Investment Agency.

D.      The Director of the Department may assign the powers, duties, functions, and responsibilities transferred to the Department under this Section IV. to the Michigan Talent Investment Agency.

E.      The Director of the Department shall provide executive direction and supervision for the implementation of all transfers under this Section IV.

F.      The Director of the Department shall administer the powers, duties, functions, and responsibilities transferred under this Section IV. in such ways as to promote efficient administration and shall make internal organizational changes within the Department as the Director deems administratively necessary to complete the realignment of responsibilities under this Order.

## V.      TRANSFER OF MICHIGAN STRATEGIC FUND

A.      All of the powers, duties, functions, and responsibilities of the Board of Directors of the Michigan Strategic Fund created by Section 5 of the Michigan Strategic Fund Act, 1984 PA 270, MCL 125.2005, are transferred to a new Board of Directors of the Michigan Strategic Fund created by this Section V.A. The Board of Directors of the Michigan Strategic Fund in existence on the date of this Order is abolished upon the effective date of this Order. The new Board of Directors of the Michigan Strategic Fund shall consist of the Chief Executive Officer of the Michigan Economic Development Corporation or his or her designee from within the Michigan Economic Development Corporation, the Director of the Department of Licensing and Regulatory Affairs or his or her designee from within the Department of Licensing and Regulatory Affairs, the State Treasurer or his or her designee from within the Department of Treasury, and eight (8) residents of this state appointed by the Governor with the advice and consent of the Michigan Senate. Not less than seven (7) of the eight (8) members appointed by the Governor shall be from the private sector, but other qualifications for appointment as a member of the new Board of Directors of the Michigan Strategic Fund shall be determined by the Governor. One (1) of the members shall be appointed by the Governor from a list of three (3) or more nominees submitted by the Speaker of the House of Representatives. One (1) of the members shall be appointed by the Governor from a list of three (3) or more nominees submitted by the Majority Leader of the Senate. Of the members initially appointed by the Governor, two (2) shall be appointed for a term expiring on February 28, 2019, one (1) shall be appointed for a term expiring on February 28, 2018, two (2) shall be appointed for a term expiring on February 28, 2017, and one (1) shall be appointed for a term expiring on February 28, 2016. After the initial appointments, members shall be appointed for terms of four (4) years. Until December 31, 2015, the new Board of Directors of the Michigan Strategic Fund shall include two (2) additional residents of this state appointed by the Governor with the advice and consent of the Michigan Senate for terms expiring on December 31, 2015. Of the members appointed by the Governor, there shall be minority, female, and small

business representation.  A member appointed by the Governor shall serve until a successor is appointed, and a vacancy shall be filled for the balance of the unexpired term in the same manner as the original appointment.  The Governor shall designate one (1) member of the board to serve as its chairperson. The new Board of Directors of the Michigan Strategic Fund shall elect from among its members a vice-chairperson. The Governor shall designate one (1) member to serve as the President of the Michigan Strategic Fund, who may be compensated for his or her service as President of the Michigan Strategic Fund.

B.    The Michigan Strategic Fund is transferred from the Department of Treasury to the Department.

C.    The Michigan Strategic Fund shall exercise its prescribed statutory powers, duties, and functions, including the functions of adjudication, rule-making, licensing, and registration, including any prescription of rules, rates, regulations, and standards, independently of the Director of the Department.  All budgeting, procurement, and related management functions of the Michigan Strategic Fund shall be performed under the direction and supervision of the Director of the Department.

D.    All records, personnel, property, unexpended balances of appropriations, allocations, or other funds used, held, employed, available, or to be made available to the Michigan Strategic Fund for the powers, duties, functions, and responsibilities transferred under Section V. of this Order shall remain with the Michigan Strategic Fund.

E.    The Director of the Department, after consultation with the State Treasurer, shall provide executive direction and supervision for the implementation of the transfers under this Section V.

## VI.    TRANSFER OF MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY

A.    The Michigan State Housing Development Authority, created by 1966 PA 346, MCL 125.1421 et seq., is hereby transferred intact from the Michigan Strategic Fund to the Department.  The Michigan State Housing Development Authority shall retain all of its statutory authority, powers, duties, functions, responsibilities, records, personnel, property, and unexpended balances of appropriations.  The Michigan State Housing Development Authority shall also retain control of all monies and funds, including but not limited to, grants, bonds, notes, reserves, and trust funds, subject to any agreements of the Michigan State Housing Development Authority with note and bond holders.

B.    The Michigan State Housing Development Authority shall exercise its prescribed statutory powers, duties, and functions, including the functions of adjudication, rule-making, licensing, and registration, including any prescription of rules, rates, regulations, and standards, independently of the Director of the Department. The budgeting, procurement, and related management functions of the Michigan State

7

Housing Development Authority shall be performed under the direction and supervision of the Director of the Department. When directing and supervising the budgeting, procurement, and related management functions of the Michigan State Housing Development Authority, the Director shall remain cognizant of the rights of the holders of Michigan State Housing Development Authority bonds or notes. Certain Michigan State Housing Development Authority bond or note contracts may require the Michigan State Housing Development Authority to either maintain sufficient personnel or contract for services to plan Michigan State Housing Development Authority programs and to supervise enforcement and, where necessary, foreclosure of Michigan State Housing Development Authority mortgage agreements.

C.      The transfer of the Michigan State Housing Development Authority is subject to any agreement executed prior to the issuance of this Order with note holders, bond holders, or issuers of instruments that are guaranteed.

D.      Nothing in this Order shall be construed to affect the status of moneys of the Michigan State Housing Development Authority. Moneys of the Michigan State Housing Development Authority are not moneys either of this state or the Department, and shall continue to be non-state funds. State funds appropriated to the Michigan State Housing Development Authority lose their identity as state funds upon payment to the Michigan State Housing Development Authority and become public funds of the Michigan State Housing Development Authority under the control of the Michigan State Housing Development Authority. Funds established by or within the Michigan State Housing Development Authority are public trust funds administered by the Michigan State Housing Development Authority.

E.      Nothing in this Order shall be construed to impair the obligations of any bond issued by or on behalf of the Michigan State Housing Development Authority. Bonds and notes issued by or on behalf of the Michigan State Housing Development Authority are obligations of the Michigan State Housing Development Authority and not obligations of either this state or the Department. Nothing in this Order shall be construed to alter the status of the Michigan State Housing Development Authority as a public body corporate and politic.

F.      All rules, orders, contracts and agreements lawfully adopted or entered into before the effective date of this Order by the Michigan State Housing Development Authority shall continue to be effective until revised, amended, or rescinded.

G.      The Director of the Department, after consultation with the President of the Michigan Strategic Fund and the Executive Director of the Michigan State Housing Development Authority, shall provide executive direction and supervision for the implementation of the transfers under this Section VI.

8

## VII. TRANSFER OF STATE LAND BANK FAST TRACK AUTHORITY

All of the powers, duties, functions, responsibilities, records, personnel, property, unexpended balances of appropriations, allocations or other funds of the State Land Bank Fast Track Authority created under Section 15 of the Land Bank Fast Track Act, 2003 PA 258, MCL 124.765, are transferred from the Executive Director of the Michigan State Housing Development Authority to the Director of the Department, except for revenue bonding powers. Any revenue bonding powers of the State Land Bank Fast Track Authority are transferred to the Michigan Strategic Fund.

## VIII. TRANSFER OF OFFICE FOR NEW AMERICANS

The Michigan Office for New Americans created within the Executive Office of the Governor by Executive Order 2014-2 is transferred from the Executive Office of the Governor to the Department of Licensing and Regulatory Affairs.

## IX. IMPLEMENTATION

A. The State Budget Director shall determine and authorize the most efficient manner possible for the handling of financial transactions and records in the state's financial management system for the remainder of the current state fiscal year for transfers made under this Order.

B. All rules, orders, contracts, plans, and agreements relating to the functions transferred by this Order lawfully adopted prior to the effective date of this Order by the responsible state agency shall continue to be effective until revised, amended, or rescinded.

C. Any suit, action, or other proceeding lawfully commenced by, against, or before any entity transferred by this Order shall not abate by reason of the taking effect of this Order. Any lawfully commenced suit, action, or other proceeding may be maintained by, against, or before the appropriate successor of any entity affected by this Order.

D. The Director of the Department and the directors of all other state departments and agencies having authority transferred to the Department of Talent and Economic Development under this Order shall immediately initiate coordination to facilitate the transfers and develop memoranda of record identifying any pending settlements, issues or compliance with applicable federal and state laws and regulations, or other obligations to be resolved related to the authority to be transferred.

E. The invalidity of any portion of this Order shall not affect the validity of the remainder of the Order, which may be given effect without any invalid portion. Any portion of this Order found invalid by a court or other entity with proper jurisdiction shall be severable from the remaining portions of this Order.

9

In fulfillment of the requirements of Section 2 of Article V of the Michigan Constitution of 1963, this Order shall be effective 60 calendar days after the beginning of the next regular legislative session after the filing of this Order.



Given under my hand and the Great Seal of the state of Michigan this __18th__ day of December, in the Year of our Lord Two Thousand Fourteen.

RICHARD D. SNYDER
GOVERNOR

BY THE GOVERNOR:

SECRETARY OF STATE

FILED WITH SECRETARY OF STATE

ON 12/18/14 AT 9:46 AM.

10

# EXHIBIT D

Exhibit A

## MSHDA NSP SUBMISSION

| IDENTIFICATION OF APPLICANT | FUNDING SOURCES | |
|---|---|---|
| Applicant(s) Michigan Land Bank Fast Track Authority | MSHDA NSP | $2,000,000 |
| Street/PO Box P.O. Box 30766 | Local Unit | |
| City Lansing | Private | |
| County Ingham | Other | $ 400,000 |
| State/Zip Michigan, 48909 | Total | $2,400,000 |
| Contact Person Shellene Petrowski | | |
| Name/Title: Property Analyst | | |
| Address: 735 E. Michigan Avenue | | |
| Lansing, Michigan 48912 | Applicant's Federal Identification Number: | |
| Telephone Number: 517-373-2796 | 386000134 | |
| Fax Number: 517-335-4797 | Applicant's DUNS Number: | |
| E-Mail Address: Petrowskis@michigan.gov | 962631656 | |

I certify that I fully understand that authorization to apply and submission of this request does not guarantee NSP funding, it is only one of the additional steps necessary to meet NSP direct funding and eligibility requirements.

THIS APPLICATION IS BEING SUBMITTED BY:

12/30/15

| NAME AND TITLE | SIGNATURE | TELEPHONE | DATE |
|---|---|---|---|

Steve Arwood        517-241-1400

PLEASE NOTE: THIS FORM MUST BE SIGNED BY THE AUTHORIZED OFFICIAL IDENTIFIED IN THE AUTHORIZING RESOLUTION.

FOUR ORIGINAL DOCUMENTS MUST BE SUBMITTED TO:

Michigan State Housing Development Authority

Office of Community Development

Attn: Shawne Haddad

735 East Michigan Avenue, P.O. Box 30044

Lansing, Michigan 48909

(SEE GENERAL INSTRUCTIONS FOR OTHER DELIVERY SERVICE ADDRESS INFORMATION)

## PROJECT NARRATIVE

The project involves complete demolition of the Highland Park Community High School, located at 15900 Woodward Avenue in Highland Park, Michigan, 48203. Work will involve abatement of hazardous materials contained within, as well as demolition of the building including all subsurface structures and flatwork in the affected area. Demolition as the end use meets HUD policy guidance on demolition, as the vacant and blighted building at 15900 Woodward Avenue creates and extreme danger to public health and safety. Subject building is located in the LMMI (85.7% at 120%AMI) census tract 5530 and has a census tract HUD risk score of 10.

The subject property is currently owned by the City of Highland Park. Subject building is a vacant, blighted high school. Attached is the blight determination and resolution from the Highland Park City Council. Property is located on a major roadway in the business district on Woodward Avenue. Local agencies are working to transform Woodward Avenue into a place that is attractive to work, shop, and play, as well as creating significant public spaces for community use. The existing blighted school building is a deterrent to the further development of Woodward Avenue, as well as a potential source of criminal activity. Break-ins have already occurred, despite onsite security.

Michigan Land Bank Fast Track Authority (MLB) has a long standing history of successful projects with the Michigan State Housing Development Authority (MSHDA). The project will be managed by the Department of Technology, Management, and Budget, with onsite project management by Cardno, an environmental firm. Bidding of the project has been completed and the notice to proceed will be issued once the publication period has ended.

## TIMELINE

Project will begin upon ending of the publication period, but no earlier than February 5th, 2016. Demolition will commence and is expected to take 150 days. Expected completion is July 2016.

## PROJECT BUDGET

| | |
|---|---|
| Demolition cost, including abatement of hazardous materials | $ 2,174,500 |
| Project oversight by Cardno | $ 40,300 |
| Administrative costs | $ 35,000 |
| Publication Costs | $ 14,063 |
| Contingency | $ 136,137 |
| **Overall Total Cost** | **$ 2,400,000** |
| Requested federal funding | $ 2,000,000 |
| Other sources (Treasury, Highland Park Sinking Fund) | $ 400,000 |
| **Total Resources** | **$ 2,400,000** |



# CITY OF HIGHLAND PARK

Return to Excellence

DeAndre Windom
Mayor

March 31, 2015

*Re: Blight Condition and Unsafe Structure located at 15900 Woodward Ave., Highland Park, MI*

The City of Highland Park has determined that the property located at 15900 Woodward Ave meets the definition of an unsafe structure and is in violation of the Highland Park City Code.

(7) Whenever the building or structure has been so damaged by fire, wind or flood, or has become so dilapidated or deteriorated, as to become an attractive nuisance to children who might play therein to their danger, or as to afford a harbor for vagrants, criminals or immoral persons, or as to enable persons to resort thereto for the purpose of committing a nuisance or an unlawful or immoral act;

(8) Whenever a building or structure used or intended to be used for dwelling purposes, because of dilapidation, decay, damage or faulty construction or arrangement or otherwise, is unsanitary or unfit for human habitation, or is in a condition that is likely to cause sickness or disease when so determined by the Health Officer, or likely to cause injury to the health, safety or general welfare of those living within; or

(9) Whenever any building becomes vacant, dilapidated and open at a door or window, leaving the interior of the building exposed to the elements or accessible to entrance by trespassers.

BOCA 122.1 Demolition of unsafe buildings; general: The Building Official may order the owner of premises upon which is located any structure or part thereof which is unsafe, as defined in Section 119.1.1, to raze and remove such structure or part thereof, or, if it can be made safe by repairs, to make the structure safe and sanitary, or, where there has been a cessation of normal construction of any structure for a period of more than two years, to raze and remove such structure or part thereof.

Based on the current condition of 15900 Woodward, the property meets the definition of unsafe structure and is explained in more detail in the attached report and pictures from the City of Highland Park Fire Marshal.

Certified by:

Cathy Square,
City of Highland Park City Administrator

# CITY OF HIGHLAND PARK

Return to Excellence

Jerome Brown
Fire Marshal
Fire Department

From: Fire Marshal J. Brown

RE: 15900 Woodward Ave.                                    March 26, 2015

To whom it may concern,

On March 26, 2015, a fire and life safety inspection was performed at the address above known as the Highland Park Renaissance High School. Unfortunately, under the guidelines and standards within the (NFPA) National Fire Protection Administration, (IFC) International Fire Code, and the (MFC) Michigan Fire Prevention Code; the building is not recommended for occupancy due to the life safety and fire hazards listed below.

- NFPA 1:13.1.3- Private fire hydrants obstructed; not functioning.
- NFPA 1.10.14.10- Excess combustibles around the exterior of the building.
- NFPA 1:14.5.2- Exit doors locked preventing exit.
- IFC 907.5.5.2- Elevator not certified.
- IFC 605.5- Electrical cords replacing permanent wiring.
- IFC 605.1- Opened electrical panels.
- Electrical defects. (Evidence of arcing from wall sockets.)
- Flooding in the elevator equipment room.
- Sewage backing up in certain areas in the basement.
- Massive fire load. (Debris throughout most classrooms.)
- Evidence of flooding in the electrical room.
- Roof is leaking in some areas.
- NFPA 1:13.3.3- Sprinkler system and alarm system compromised.
- Fire pumps not functioning and/or no record testing.

If you have any questions or concerns in regards to this matter, please don't hesitate to call me at (313)556-6149.

Thank you,

Jerome T. Brown
Fire Marshal
Highland Park Fire Dept.

Highland Park Fire Department
25 Gerald
Highland Park, Michigan 48203
313-852-3092 Phone
313-556-6149 Cell
313-852-3234 Fax



# CITY OF HIGHLAND PARK

Return to Excellence

DeAndre Windom
Mayor

## RESOLUTION AUTHORIZING THE SITE ACCESS AND DEMOLITION LICENSE AGREEMENT BETWEEN THE CITY OF HIGHLAND PARK, THE HIGHLAND PARK SCHOOL DISTRICT AND THE STATE OF MICHIGAN LAND BANK FAST TRACK AUTHORITY

BE IT RESOLVED that the Highland Park City Council hereby approves the Agreement between the City of Highland Park, The Highland Park School District and the State of Michigan Land Bank Fast Track Authority that authorizes the demolition and removal of the structure located at 15900 Woodward Ave., Highland Park, Michigan based on certain contingencies outlined in the attached Agreement.

AYES: _____4_____     NAYS: ___1 - Councilmember McClary_

Certified by City Clerk

Approved
Dec. 21. 2015

Brenda Green, City Clerk

Date: December 21, 2015

Robert B. Blackwell Municipal Building
12050 Woodward Avenue
Highland Park, Michigan 48203
313-252-0050 ext. 240
313-852-7320 fax



**STATE OF MICHIGAN**
**MICHIGAN STATE HOUSING DEVELOPMENT AUTHORITY**

RICK SNYDER
GOVERNOR

KEVIN ELSENHEIMER
EXECUTIVE DIRECTOR

December 21, 2015

Cathy Square, City Administrator
City of Highland Park
12050 Woodward Avenue
Highland Park, MI 48203-3578

Dear Ms. Square:

In consideration of the recent request by the community for direct program funding under the Neighborhood Stabilization Program (NSP), the Michigan State Housing Development Authority (MSHDA) has made a conditional reservation funding in the amount of up to $2,000,000 to be used towards the demolition of the former Highland Park High School building. It is our understanding that the project will be facilitated by the Michigan Land Bank Fast Track Authority (MLB).

Grant funds will be awarded subject to the submission and approval of the following items:

- Submission of a final project application by the MLB including a final project budget, written commitment letters for all leveraged funding, and submission of an executed Site Access and Demolition License Agreement in a form that is deemed acceptable by MSHDA's Chief Housing Investment Officer.
- Successful completion of the Part 58 Environmental review process by MSHDA, including publication, public comment period and receipt of an approved and executed Authority to Use Grant Funds, HUD Form 7015.16. No parties shall take any choice-limiting actions on site until completion of the Environmental Review process.

Due to the monetary size of this grant and its impact on our overall grants program, if the aforementioned conditions are not met prior to April 1, 2016, the reservation for this award will be effectively withdrawn.

Should you have any questions, please contact Michele Wildman at (517) 373-4363.

Sincerely,

Kevin A. Elsenheimer
Executive Director



# EXHIBIT E

## SITE ACCESS AND DEMOLITION LICENSE AGREEMENT

This Site Access License and Demolition Agreement ("Agreement") is entered into by and between the City of Highland Park, 12050 Woodward Avenue, Highland Park, Michigan 48203 ("City"), the Highland Park School District, 12360 Woodward Avenue, Highland Park, Michigan 48203 ("District") and the State of Michigan Land Bank Fast Track Authority, 735 East Michigan Avenue, Lansing, Michigan 48912 ("MLB").

### Section 1:  Recitals

a.  City and District require demolition of the building known as Highland Park High School, including the complete removal of the structure  located at 15900 Woodward Avenue, Highland Park, Michigan 48203 (the "Structure").  City is the owner of the land ("Land") upon which the Structure has been constructed.  District is the owner of the Structure.

b.  The terms and conditions of the parties' agreement are as follows.

### Section 2:  Exclusive License Agreement

City and District shall provide MLB and MLB's subcontractors with unfettered access to the Structure and the Land at all times during the term of this Agreement, and shall not interfere in any manner with the performance by MLB of its duties hereunder.  This Agreement grants to MLB an irrevocable exclusive license for access and for performance of the Structure demolition and removal work (the "Work") contemplated herein.  This Agreement grants to MLB the right to perform the Work, but does not obligate MLB to perform the Work.  This license also extends to, and is fully assignable to, all subcontractors as shall contract with MLB for performance of the Work.

### Section 3:  Financing Contingency

a.  Notwithstanding any provision of this agreement, the parties hereto agree and acknowledge that this Agreement does not constitute a commitment of funds or site approval, and that such commitment of funds or approval may occur only upon satisfactory completion of the federal environmental review and receipt by the MLB of an executed "Authority to Use Grant Funds" or equivalent letter.  The parties further agree that the provision of any funds to the project is conditioned on the MLB's determination to proceed with, modify or cancel the project based on the results of a subsequent environmental review.

b.  The parties hereto agree and acknowledge that the parties, project owner, and its contractors are prohibited from undertaking or committing any funds to physical or choice-limiting actions, including property acquisition, demolition, movement, rehabilitation, conversion, repair or construction, or leasing or disposition prior to the execution of the "Authority to Use Grant Funds" or equivalent letter.  Violation of this provision may result in the denial of any funds under the agreement.

### Section 4:  MLB's Duties

a.  MLB shall enter into contracts for all necessary labor, materials and equipment to demolish the Structure and remove it from City's property in accordance with generally accepted demolition practices and procedures.

b. MLB shall be responsible for obtaining all necessary demolition permits or approvals from appropriate sources with respect to the Work. Upon receipt of a written request from the City or District, MLB shall provide the City or District with copies of all such permits and approvals.

c. While performing the Work in accordance with this Agreement, MLB shall comply with all laws, orders, ordinances, rules, regulations or codes of any government authority having jurisdiction over the Structure or the Land.

d. The use and removal of hazardous materials during the course of said Work shall be handled at all times in compliance with all applicable environmental laws.

e. City and District shall not pursue any claims against MLB with respect to any loss, damage, or liability arising from the performance of said Work. MLB shall not be obligated or liable under this Agreement with respect to any condition existing at the commencement of this Agreement, including, but not limited to environmental contamination. In consideration of the Work provided by the MLB in this Agreement, the City and District release and discharge the MLB, any subsidiaries, affiliates, directors, officers, agents, servants, employees, representatives, assigns, and successors, past and present, from all claims, debts, demands, rights, liens, charges, lawsuits and causes of action, including, but not limited to, claims in law or in equity; and any other causes of action whether known or unknown to the City or District, or that accrue after this Agreement by reason of any existing facts, known or unknown, in favor of the City or District against the MLB concerning or related to this Agreement.

f. To the extent practicable, MLB or its subcontractors shall protect and preserve main sewer lines and water lines indicated or made known to it by City or District, and shall provide for disconnects of same as necessary. MLB shall also arrange for gas and electric service to be shutoff and disconnected.

g. MLB or its subcontractors shall remove all waste materials, rubbish, and equipment upon completion of the demolition, and shall dispose of all waste materials and rubbish in a licensed landfill.

h. MLB or its subcontractors shall operate, maintain, and leave the demolition site in a generally orderly condition.

i. MLB shall direct its subcontractors to erect and maintain all reasonable or necessary safeguards for protection of persons and property, including safety barriers to and warnings of dangers and hazards, which safeguards and notices shall remain in place until completion of the Work in accordance with this Agreement.

j. All of the duties of MLB shall be subject to termination by MLB in accordance with the provisions of Section 6(b) below.

## Section 5: Records

MLB shall maintain books, records, computer records, documents and other evidence relating to performance of the work under this Agreement in accordance with generally accepted accounting and auditing principles and practices. Such records shall be retained for a period of one (1) year following completion of the Work.

## Section 6:  Term

a.  Except as otherwise provided, this Agreement shall commence upon the date upon which it is last signed by the parties, and shall terminate on December 31, 2016.

b.  This Agreement may be terminated without cause by MLB upon twenty-four (24) hours' written notice to the other parties.  Upon any such termination, MLB shall have no further obligations or duties hereunder.

c.  Should a party commit any breach or default under this Agreement, and should such breach or default not be corrected within five (5) business days after receipt by the party or written notice from the non-breaching party specifying the breach or default, this Agreement may be terminated without further notice by the non-breaching party.

d.  This Agreement may be extended for an additional period of time upon the written agreement of all parties.

## Section 7:  Relationship of Parties

a.  The parties agree that MLB is an independent contractor for the purposes of this Agreement.  City and District are interested only in the results to be achieved by MLB.  MLB's performance of services and hours worked shall be entirely within MLB's control, and City and District shall rely upon MLB to devote the time reasonably necessary to perform in accordance with this Agreement.  However, MLB shall generally perform the work in accordance with currently accepted methods and procedures for demolition and removal.

b.  MLB shall not be considered an agent or employee of City or of District for any purpose, and neither MLB nor its employees nor its subcontractors are entitled to any of the benefits that City or District provides for their respective employees.  MLB shall not be subject to or covered by any of City's or District's employee handbooks, collective bargaining agreements, or other personnel policies.

c.  Neither City nor District shall be responsible for covering MLB under any workers' compensation insurance or unemployment compensation insurance plans.

d.  MLB shall have no authority or right to obligate City or District in any way.  MLB shall identify itself as an independent contractor and shall not hold itself out as an employee or agent of City or District.

e.  Both City and District agree to use MLB and its subcontractors exclusively for the performance of the Work, and City and District agree that they shall not enter into contracts for similar or other services with other parties with respect to the Work during the term of this Agreement.

## Section 8:  Subcontracts

MLB shall bind all subcontractors to the provisions of this Agreement, and said subcontractors are directly responsible to MLB.  All subcontractors shall be properly licensed to conduct the Work.

3

## Section 9: MLB's Right to Perform Services

MLB represents and warrants that the performance of the services herein and other duties and obligations of MLB set forth in this Agreement are not in violation of any other agreement to which MLB is a party or by which MLB is bound.

## Section 10: Governmental Immunity

Neither City, District nor MLB waive their respective governmental immunity by entering into this Agreement, and each party fully retains all immunities and defenses provided by law with respect to any action based upon or occurring as a result of this Agreement.

## Section 11: Insurance and Bonding

a.      MLB shall require MLB's subcontractors to purchase and maintain, at their sole expense and as long as they are providing services to MLB or to City or to District, the following insurance coverage:

   i.   Commercial General Liability – Occurrence form, including coverage for bodily injury, personal injury, property damage (broad form), premises/operations, blanket contractual, and products/completed operations. Coverage shall be endorsed to include MLB, City and District as additional insureds for work performed by or for MLB in accordance with this Agreement.

   Minimum Limits:

   x.   $2,000,000 per occurrence/$2,000,000 general aggregate

   y.   $2,000,000 aggregate for products and completed operations

   ii.  Automobile – Michigan no-fault coverage, and residual automobile liability, comprehensive form, covering owned, hired, and non-owned automobiles. Coverage shall be endorsed to include MLB, City and District as additional insureds for work performed by or for MLB in accordance with this Agreement.

   Minimum Limits:

   v.   No-fault coverages – statutory

   w.   $500,000 per person/$1,000,000 per accident – bodily injury

   x.   $500,000 per occurrence – property damage **OR**

   y.   A combined single limit of $2,000,000 per occurrence

   z.   Deductible amounts shall not exceed $25,000

4

iii. <u>Workers' Compensation and Employer's Liability</u> – Statutory coverage or proof acceptable to MLB of approval as a self-insurer by the State of Michigan.

Minimum Limits:

x.　　Workers' Compensation – statutory

y.　　Employer's Liability - $1,000,000 each accident/$1,000,000 disease – each employee

z.　　$1,000,000 aggregate disease

b.　　Insurance coverage shall cover all claims against MLB, City, District, or their respective officials and employees, arising out of the work performed by MLB or any of its subcontractors under this Agreement. For all work subcontracted, it shall be the responsibility of MLB's subcontractors to maintain Independent Contractor's Protective Liability Insurance with limits equal to those specified above for Commercial General Liability Insurance. In addition, MLB's subcontractors shall provide proof of Workers' Compensation Insurance for all subcontractors in compliance with the required statutory limits of the State of Michigan.

c.　　Said policies of insurance shall be with companies licensed to do business in the State of Michigan and in a form satisfactory to MLB. Cancellation, material restriction, non-renewal or lapse of any of the required policies shall be grounds for immediate termination of this Agreement by MLB. Any reduction or exhaustion in the limits of required insurance coverage shall not be deemed to limit the indemnification, if any, afforded in accordance with this Agreement or any amendments thereto.

d.　　All such insurance policies shall be required to be presented to and approved by MLB prior to commencement of any portion of the Work. In addition, all subcontractors shall be required to post payment and performance bonds in such amounts and with such bonding companies as shall be specified by MLB, and such bonds shall also be required to be presented to and approved by MLB prior to commencement of the Work.

## Section 12:  Notice

All notices, demands or other writings permitted or required by the terms of this Agreement shall be deemed to have been fully given, made or sent when made in writing and deposited in the United States Mail, registered and postage prepaid, and addressed to the Contract Administrators as follows:

**City:** 　Brenda Green, City Clerk
　　　City of Highland Park
　　　12050 Woodward Avenue
　　　Highland Park, MI 48203

**District:** Highland Park School District
　　　12360 Woodward Avenue
　　　Highland Park, Michigan 48203
　　　Attn: Steve Schiller – schiller@hipark.org

5

**MLB:** Michigan Land Bank Fast Track Authority
   P.O. Box 30766
   Lansing, Michigan 48909
   Attn: Patrick Ennis

The address to which any notice, demand or other writing may be given or sent to any party may be changed by written notice given to the other parties.

## Section 13: Entire Agreement

This Agreement, together with any affixed schedules, exhibits or addenda referred to herein, shall constitute the entire agreement between the parties. Any prior understanding, representation or negotiation of any kind preceding the date of this Agreement shall not be binding upon the parties except to the extent incorporated in this Agreement.

## Section 14: Attorney Review

The parties represent that they have carefully read this Agreement and have had the opportunity to review it with an attorney. The parties affirmatively state that they understand the contents of this Agreement and sign it as their free act and deed.

## Section 15: Modification

Any modification of this Agreement or additional obligation assumed by any party in connection with this Agreement shall be binding only if evidenced in a writing signed by each party or its authorized representative.

## Section 16: Partial Invalidity

The partial invalidity of any portion of this Agreement shall not be deemed to affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the parties agree that the remaining provisions shall be in full force and effect as if they had been executed by the parties subsequent to the deletion of the invalid provision.

## Section 17: Absence of Waiver

The failure of a party to insist on the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of such terms and conditions, shall not be construed as thereafter waiving such terms and conditions, which shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

## Section 18: Assignment

The rights and obligations of each party under this Agreement are personal to that party and may not be assigned or transferred to any other person, firm, corporation or other entity without the prior written consent of the other parties. In the event of a proper assignment, this Agreement shall be binding upon and inure to the benefit of the parties' successors and assigns.

6

## Section 19:  No Third Party Benefit

The provisions of this Agreement are for the benefit of the parties hereto, and not for the benefit of any other person or legal entity.

In witness whereof, each party to this Agreement has caused it to be executed on the date as indicated below.

**City of Highland Park**

By: _DEANDRE WINDOM_
Its: _MAYOR_
Date: _12-22-15_

**Highland Park School District**

By: _____
Its: _____
Date: _____

**State of Michigan Land Bank Fast Track Authority**

By: _____
Its: _____
Date: _____

7

# EXHIBIT F

## ESCROW AGREEMENT
## FOR DEMOLITION ACTIVITIES

THIS AGREEMENT is made and entered into this __24th__ day of February, 2016, between the Highland Park School District (the "HPSD") and the State of Michigan Land Bank Fast Track Authority (the "Authority" or "Escrow Agent).

### R E C I T A L S:

A.      The Authority has undertaken the demolition of the Highland Park High School (the "Demolition"), pursuant to the Site Access and Demolition License Agreement (the "License Agreement") entered into between the HPSD, the City of Highland Park and the Authority on February 9, 2016.

B.      The Authority has bid the Demolition, received bids and chosen a contractor.

C.      The Demolition is being partially financed by a $2,000,000 NSP grant made by the Michigan State Housing Development Authority ("MSHDA") to the Authority for the purpose of demolishing the Highland Park High School (the "Grant").

D.      Any costs of the Demolition not covered by the Grant will be paid for out of a $500,000 contribution (the "Gap Funding") from the Highland Park School District's sinking fund to the Authority which shall be held in escrow and used pursuant to the terms of the License Agreement and this Agreement (the "Escrow").

IN CONSIDERATION of the Authority agreeing to undertake the Demolition and the Gap Funding being placed in this Escrow, it is agreed between the parties as follows:

1.      The Authority shall complete the Demolition, the Work as described in the License Agreement and all other duties as described in the License Agreement on or before December 31, 2016, free and clear of any and all liens, claims or other encumbrances and in accordance with the License Agreement.

2.      The HPSD shall deposit with the Authority, as escrow agent, the Gap Funding in the amount of $500,000, for the purpose of assuring completion of the Demolition and the License Agreement.

        a.      The HPSD hereby establishes with the Authority a separate special account ("Escrow Account") for the receipt and disbursement, pursuant to the terms of this Agreement, of the Gap Funding.

        b.      The Escrow Agent hereby accepts appointment as the Escrow Agent and agrees, subject and pursuant to the provisions of this Agreement, to establish and maintain the Escrow Account, and to hold, invest and disburse the Gap Funding (as defined herein) as provided in this Agreement.

3.      The funds deposited with the Escrow Agent pursuant to Paragraph 2 shall be held in escrow and the Escrow Agent shall invest the Gap Funding, initially and from time to time, in an interest bearing account.

4.      The Gap Funding deposited with the Escrow Agent pursuant to Paragraph 2 shall be disbursed when and as follows:

a. Upon the complete exhaustion of the MSHDA Grant, the Authority may release all or portions of the Gap Funding held in Escrow required for the payment of demolition and other costs in accordance with the provisions of Paragraph 1.

b. Copies of invoices and other documents to support the amount of any of the demolition shall be maintained by the Escrow Agent.

c. All other requirements of the License Agreement shall have been satisfied.

5. The Authority may undertake to perform any and all activities which, in the judgment of an Authorized Officer of the Authority, are necessary and proper for the completion of the Demolition.

6. The Gap Funding deposited with the Escrow Agent pursuant to Paragraph 2 shall be released from escrow and may be applied by an Authorized Officer of the Authority to the payment of any and all costs, expenses or charges incurred in connection with the completion of the Demolition by the Authority. Upon completion of the Demolition and the payment in full of all costs and charges therefor, any remaining balance of the Gap Funding, and interest earnings thereon, shall be delivered to the HPSD or its designee.

7. The Authority shall not be responsible for the completion of the Demolition beyond the expenditure of the amount of funds deposited with the Authority pursuant to Paragraph 2. If such funds are insufficient for the completion of the Demolition the Authority shall have no obligation to proceed further with the completion of the Demolition or to demand or obtain additional funds for such completion.

8. Unless expressly extended by a written instrument executed by all of the parties hereto, this Agreement shall terminate and be of no further force and effect upon the occurrence of the earlier of the following events: (a) the disbursement of all Gap Funding and interest earnings thereon pursuant to Section 6 above, or (b) midnight, December 31, 2016.

9. The Escrow Agent assumes no responsibility except for the maintenance of the Escrow and the disbursement of the Gap Funding pursuant to this Agreement, and, subject to the terms of this Agreement, shall not be liable for any action taken by it if believed by it in good faith to be in accordance with the terms of this Agreement. In holding the Gap Funding and in determining the disbursement thereof, the Escrow Agent shall be governed entirely by the terms of this Agreement.

10. The HPSD specifically waives any and all claims, rights, demands, and causes of action against the Escrow Agent that may arise due to the performance of the Escrow Agent's duties and responsibilities under this Agreement except in the event of willful misconduct, gross negligence or bad faith by the Escrow Agent.

11. All notices, demands or other writings permitted or required by the terms of this Agreement shall be deemed to have been fully given, made or sent when made in writing and deposited in the United States Mail, registered and postage prepaid, and addressed as follows:

**District:**      Highland Park School District
                   12360 Woodward Avenue
                   Highland Park, MI 48203
                   Attn: Steve Schiller – schiller@hipark.org

**MLB:**           Michigan Land Bank Fast Track Authority
                   P.O. Box 30766
                   Lansing, MI 48909
                   Attn: Patrick Ennis – ennisp1@michigan.gov

The address to which any notice, demand or other writing may be given or sent to any party may be changed by written notice given to the other party.

12.     This Agreement shall be governed by and construed in accordance with the law of the State of Michigan.

13.     This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same instrument.

The parties, by their authorized representatives, execute this Escrow Agreement as of the day and year shown above.

HIGHLAND PARK SCHOOL DISTRICT

By:_____
    Steven M. Schiller
    Its: Emergency Manager

MICHIGAN LAND BANK FAST TRACK AUTHORITY

By:_____
    Greg Tedder
    Authorized Officer

BY: STEVE ARWOOD

ITS: DIRECTOR OF THE DEPARTMENT OF TALENT AND ECONOMIC DEVELOPMENT, PURSUANT TO EXECUTIVE ORDER 2014-12 DATED DECEMBER 18, 2014

# EXHIBIT G

# SCHOOL DISTRICT OF THE CITY OF HIGHLAND PARK

**Office of the Emergency Manager**
**Steven M. Schiller**

---

EM Order 2016-1

### BY THE POWER AND AUTHORITY VESTED IN
### THE EMERGENCY MANAGER FOR THE
### SCHOOL DISTRICT OF THE CITY OF HIGHLAND PARK, MICHIGAN
### ("EMERGENCY MANAGER")
### THROUGH 2012 PA 436, MCL 141.1541 — 141.1575

### THE EMERGENCY MANAGER
### HEREBY ISSUES THE FOLLOWING:

### ORDER

Whereas the School District of the City of Highland Park ("School District") maintains an account for the proceeds of sinking fund levies for purposes authorized by School District voters including for building demolition purposes,

Whereas the School District has ended any use of its former school building on 15900 Woodward Avenue known as the Highland Park High School several years previously,

Whereas the School District entered in 1972 a land lease on the property upon which the High School was constructed through an agreement with the City of Highland Park ("City") which was entitled Reciprocal Lease Agreement,

Whereas the School District entered into an amendment to the Reciprocal Lease Agreement on March 30, 2015 wherein the School District agreed to convey back to the City for valuable consideration its interest in the land lease for the High School property ("property") contingent upon funding becoming available from the Michigan State Housing Development Authority ("MSHOA") for the costs of demolition and removal of the building ("the Demolition Project"),

A:

Whereas the City, School District and the Michigan Land Bank Fast Track Authority (MLB) entered into a Site Access and Demolition License Agreement ("Agreement") under which the MLB will perform the Demolition Project pursuant to the terms of the Agreement,

1

Whereas, on December 21, 2015, MSHDA conditionally reserved funding in the amount of up to $2 million to be used towards the Demolition Project, subject to items including commitment of the additional funding needed to complete the Demolition Project ("the gap funding"), and on February 8, 2016, the authority to use the reserved funding was provided by the U.S. Department of Housing and Urban Development,

Whereas, to provide the gap funding, the School District is placing $500,000.00 in escrow with the MLB for purposes of contributing toward the costs of the Demolition Project and will thereby permit the conveyance of the School District's interest in the building to the City as agreed with the City on March 30, 2015,

THEREFORE IT IS HEREBY ORDERED:

That the $500,000.00 maintained in the School District's sinking fund proceeds shall, pursuant to the terms of the Escrow Agreement (a form of which is attached) executed by the School District and the MLB, be paid to the MLB to be held in and interest bearing escrow account for the purpose of contributing toward the costs of the MLB Demolition Project as may be necessary after expenditure of other funds available to the MLB for purposes of paying such. Any funds, including interest earned, remaining in the escrow account after completion of the Demolition Project shall be returned to the School District for deposit back into the School District's sinking fund account for other purposes authorized by the voters for funds levied and deposited into that account.

This Order may be amended, modified, rescinded, or terminated only by a subsequent Order issued by the Emergency Manager.

Dated: February 24, 2016

Steven M. Schiller
Emergency Manager

3441656v1

2

# EXHIBIT H

**From:** Kiffer, Kelly M. (Treasury)
**Sent:** Thursday, April 14, 2016 7:03 AM
**To:** Thelen, Janell (MSHDA) <ThelenJ2@michigan.gov>
**Cc:** Fedewa, Jason (MSHDA) <FedewaJ4@michigan.gov>
**Subject:** RE: Wire Transfer - Tax Revenue Account Highland Park Public Schools

Thank you for the heads up!  We would have given it to School Bond Loan.

Kelly

---

**From:** Thelen, Janell (MSHDA)
**Sent:** Wednesday, April 13, 2016 5:41 PM
**To:** Kiffer, Kelly M. (Treasury) <KifferK@michigan.gov>
**Cc:** Fedewa, Jason (MSHDA) <FedewaJ4@michigan.gov>
**Subject:** FW: Wire Transfer - Tax Revenue Account Highland Park Public Schools

FYI... This is receipt coming in for Land Bank Agency 636.

Janell M. Thelen, CPA
Chief Accountant, Finance
Michigan State Housing Development Authority
ph. 517.335.2040 ● fx. 517.373 2450

For information about MSHDA and social networking, visit http://www.michigan.gov/mshdasocialnetwork

**From:** Lewis, John [mailto:lewisjoh@mhpsnet.org]
**Sent:** Wednesday, April 13, 2016 4:54 PM
**To:** Thelen, Janell (MSHDA)
**Subject:** Fwd: Wire Transfer - Tax Revenue Account Highland Park Public Schools

Hello Janell,

I spoke with you a few weeks back about a transfer going into your JP Morgan account from Highland Park Public Schools.  Just giving you a heads up that you will be receiving this from us soon, if not already received.  Please let me know if you need any further clarification.

Thanks,

John

1

---------- Forwarded message ----------
From: **Mcafoos, Susan M** <susan.mcafoos@bnymellon.com>
Date: Wed, Apr 13, 2016 at 3:40 PM
Subject: RE: Wire Transfer - Tax Revenue Account Highland Park Public Schools
To: "Boyne, David (Treasury)" <BoyneD@michigan.gov>, "Barton, John (Treasury)"
<BartonJ@michigan.gov>, "lewisjoh@mhpsnet.org" <lewisjoh@mhpsnet.org>
Cc: "Przytulski, Kellee" <kellee.przytulski@bnymellon.com>, "Golson, Allen L"
<allen.l.golson@bnymellon.com>

Hi David,
Thank you for the clarification.   We have sent out the funds to you.  Confirmation below regarding the wire details.  Have
a good day.
Thank you,
Susan


$500,000.00
FTS Release: 2016-04-13 15:35:29
████████████████

Susan McAfoos
Workflow Lead – Pooled Finance Unit
BNY Mellon
Corporate Trust
10161 Centurion Parkway North
Jacksonville, FL  32256
T:  904-998-4705
F:  904-645-1998
susan.mcafoos@bnymellon.com

---

**From:** Boyne, David (Treasury) [mailto:BoyneD@michigan.gov]
**Sent:** Wednesday, April 13, 2016 2:11 PM
**To:** Mcafoos, Susan M; Barton, John (Treasury); lewisjoh@mhpsnet.org
**Cc:** Przytulski, Kellee; Golson, Allen L
**Subject:** RE: Wire Transfer - Tax Revenue Account Highland Park Public Schools
**Importance:** High


Hi Susan,
Yes, this request is to come from the Highland Park tax revenue account.  The funds are coming to the State
instead of the school as done in the past.  Please let me know if you have any questions.
David
517.241.2028

From: Mcafoos, Susan M [mailto:susan.mcafoos@bnymellon.com]
Sent: Wednesday, April 13, 2016 12:47 PM
To: Boyne, David (Treasury) <BoyneD@michigan.gov>
Cc: Przytulski, Kellee <kellee.przytulski@bnymellon.com>; Golson, Allen L
<allen.l.golson@bnymellon.com>
Subject: FW: Wire Transfer - Tax Revenue Account Highland Park Public Schools
Importance: High


David,
Good afternoon.  Can you please confirm if this request is to come from the Highland Park's tax revenue account█████████Also please confirm that the
funds are to come to the MFA instead of the school as done in the past.
Thank you,
Susan

Susan McAfoos
Workflow Lead – Pooled Finance Unit
BNY Mellon
Corporate Trust
10161 Centurion Parkway North

2

Jacksonville, FL 32256
T: 904-998-4705
F: 904-645-1998
susan.mcafoos@bnymellon.com

---

**From:** Przytulski, Kellee
**Sent:** Wednesday, April 13, 2016 12:08 PM
**To:** Mcafoos, Susan M
**Subject:** FW: Wire Transfer - Tax Revenue Account Highland Park Public Schools
**Importance:** High

Per our discussion.
Kellee Przytulski
Vice President, Client Service Manager
BNY Mellon
Corporate Trust - Global Client Services
719 Griswold Street, 9th Floor / Ste 930
Detroit, MI 48226
T 313 964 6362 1  F 313 967 5190
kellee.przytulski@bnymellon.com
www.bnymellon.com

---

**From:** Boyne, David (Treasury) [mailto:BoyneD@michigan.gov]
**Sent:** Wednesday, April 13, 2016 10:44 AM
**To:** Przytulski, Kellee; Packard, Nancy L; Davis, Tammy L
**Cc:** Barton, John (Treasury); lewisjoh@mhpsnet.org; Agolli, Valerie (TREASURY); Golson, Allen L
**Subject:** Wire Transfer - Tax Revenue Account Highland Park Public Schools
**Importance:** High

Hello Kellee,
Please find attached a wire transfer for the School District of the City of Highland Park.  Please let me know if you have any questions.  Thanks.
David Boyne
Michigan Department of Treasury
517.241.2028

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Access, copying or re-use of the e-mail or any attachment, or any information contained therein, by any other person is not authorized. If you are not the intended recipient please return the e-mail to the sender and delete it from your computer. Although we attempt to sweep e-mail and attachments for viruses, we do not guarantee that either are virus-free and accept no liability for any damage sustained as a result of viruses.

Please refer to http://disclaimer.bnymellon.com/eu.htm for certain disclosures relating to European legal entities.

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Access, copying or re-use of the e-mail or any attachment, or any information contained therein, by any other person is not authorized. If you are not the intended recipient please return the e-mail to the sender and delete it from your computer. Although we attempt to sweep e-mail and attachments for viruses, we do not guarantee that either are virus-free and accept no liability for any damage sustained as a result of viruses.

Please refer to http://disclaimer.bnymellon.com/eu.htm for certain disclosures relating to European legal entities.


--
John Lewis
Fiscal Control Manager
Muskegon Heights Public Schools/Highland Park Public Schools
Phone:  231-830-3219
Fax:  231-830-3560

4

# EXHIBIT I

Case 2:16-cv-12755-SJM-MKM    ECF No. 1, PageID.96    Filed 07/26/16    Page 96 of 107

 **Gmail**                              **Robert Davis** <davisrobert854@gmail.com>

---

## Request for Audit Reports and Address of Principal Office for H.P. School District and HP Board of Education

---

**Robert Davis** <davisrobert854@gmail.com>                    Fri, Jun 3, 2016 at 12:57 PM
To: schillers@mhpsnet.org, herrinr@hipark.k12.mi.us

Mr. Schiller:
I previously sent a request to Dr. Donald Weatherspoon, the former Emergency Manager for the Highland Park School District, respectfully requesting to receive copies of the financial audit reports for the 2014-2015 Fiscal Year and copies of the Financial Audit Reports of the Sinking Fund for the fiscal years of 2012-2013, 2013-2014, and 2014-2015. In a letter dated December 28, 2015, Ms. Herring advised me that I would be permitted to inspect copies of the requested audit reports at the "Board Office" once restoration work was completed. However, I am unaware of a principle office for the School District and/or the Board of Education. The previous principle offices for the School District and the Board of Education have all since been closed. In fact, the address presently listed on the School District's website is a post office box and not a physical address.

Accordingly, can you please provide me with the address of the principal office for the Highland Park School District and its Board of Education? Otherwise, if one does not exist, I again respectfully request to receive a copy of the aforementioned audit reports in accordance with Mich. Const. 1963, article 9, sec. 23. I respectfully request to receive a copy of said audit reports via electronic mail. However, if I must pick them up from a location, please let me know. If I do not receive a response to this request from you by the close of business on or before Monday, June 6, 2016, I will be compelled to explore taking legal action against you and the School District.

I look forward to your response.

Respectfully submitted,
Robert Davis

# EXHIBIT J

District: Keep original
and provide copy, along
with Public Summary, to
requestor at no charge.

**Highland Park School District, Wayne County**
**131 Pilgrim**
**Highland Park, MI 48203**
**Phone: (313) 865-9069 / Fax: (313) 957-3112**

Denial Form

## Notice of Denial of FOIA Request
### Michigan Freedom of Information Act, Public Act 442 of 1976, MCL 15.231, *et seq.*

Request No.:_2016 # 2_____ Date Received: _06/15/16_____ Check if received via ☒Email ☐Fax ☐Other
Electronic Method
Date of This Notice: _06/17/2016_____                    Date delivered to junk/spam folder: _____
*(Please Print or Type)*                                           Date discovered in junk/spam folder: _____

| Name: Robert Davis | Phone |
|---|---|
| Firm/Organization | Fax |
| Street | Email: <u>davisrobert854@gmail.com</u> |
| City | State      Zip |

**Request for:** ☐Copy☐Certified Copy  ☐ Record inspection☐ Subscription to record issued on regular basis

**Delivery Method:** ☐ Will pick up   ☐ Will make own copies onsite ☐ Mail to address above ☒ Email to address above
☐ Deliver on digital media provided by the District: _____

**Record(s) You Requested:** (List here or see attached copy of original request) _____
_____School District Sinking Fund Audit Reports for 2012-13, 2013-14 and 2015 and School District Audit Report
for 2015-16 school year

☐ **All   OR**    ☐**Part** of your request for records has been denied. Please refer to this form for an explanation. If you have
any questions regarding this denial, contact <u>Theresa A. Maner</u> at <u>(313) 402-026</u>or manerthe@hipark.org.

### Reason for Denial:
☐ **1. Exempt from Disclosure:** This item is exempt from disclosure under FOIA Section 13, Subsection _____ (insert
number), because: _____

☒ **2. Record Does Not Exist:** This item does not exist under the name provided in your request or by another name
reasonably known to the District. A certificate that the public record does not exist under the name given is attached. If you
believe this record does exist, provide a description that will enable us to locate the record: <u>Sinking Fund Audits for the
years requested were not prepared and thus do not exist. General Fund Audit for 2015-16 school year has not been prepared
as of the present time.</u>

☐ **3. Redaction:** A portion of the requested record had to be separated or deleted (redacted) as it is exempt under FOIA
Section 13, Subsection _____ (insert number), because: _____

A brief description of the information that had to be separated or deleted: _____

### Notice of Requestor's Right to Seek Judicial Review
You are entitled under section 10 of the Michigan Freedom of Information Act, MCL 15.240, to appeal this denial to the District Board
or to commence and action in the Circuit Court to compel disclosure of the requested records if you believe they were wrongfully
withheld from disclosure. If, after judicial review, the court determines that the district has not complied with MCL 15.235 in making
this denial and orders disclosure of all or a portion of a public record, you have the right to receive attorneys' fees and damages as
provided in MCL 15.240. (See back of this form for additional information on your rights.)
Signature of FOIA Coordinator: [sign here]   *Theresa A. Maner*                Date: 06/17/2016

3217743v1

**FREEDOM OF INFORMATION ACT (EXCERPT)**
**Act 442 of 1976**

**15.240 amended Options by requesting person; appeal; actions by public body; receipt of written appeal; judicial review; civil action; venue; de novo proceeding; burden of proof; private view of public record; contempt; assignment of action or appeal for hearing, trial, or argument; attorneys' fees, costs, and disbursements; assessment of award; damages.**

Sec. 10.

(1) If a public body makes a final determination to deny all or a portion of a request, the requesting person may do 1 of the following at his or her option:

(a) Submit to the head of the public body a written appeal that specifically states the word "appeal" and identifies the reason or reasons for reversal of the denial.

(b) Commence a civil action in the circuit court, or if the decision of a state public body is at issue, the court of claims, to compel the public body's disclosure of the public records within 180 days after a public body's final determination to deny a request.

(2) Within 10 business days after receiving a written appeal pursuant to subsection (1)(a), the head of a public body shall do 1 of the following:

(a) Reverse the disclosure denial.

(b) Issue a written notice to the requesting person upholding the disclosure denial.

(c) Reverse the disclosure denial in part and issue a written notice to the requesting person upholding the disclosure denial in part.

(d) Under unusual circumstances, issue a notice extending for not more than 10 business days the period during which the head of the public body shall respond to the written appeal. The head of a public body shall not issue more than 1 notice of extension for a particular written appeal.

(3) A board or commission that is the head of a public body is not considered to have received a written appeal under subsection (2) until the first regularly scheduled meeting of that board or commission following submission of the written appeal under subsection (1)(a). If the head of the public body fails to respond to a written appeal pursuant to subsection (2), or if the head of the public body upholds all or a portion of the disclosure denial that is the subject of the written appeal, the requesting person may seek judicial review of the nondisclosure by commencing a civil action under subsection (1)(b).

(4) In an action commenced under subsection (1)(b), a court that determines a public record is not exempt from disclosure shall order the public body to cease withholding or to produce all or a portion of a public record wrongfully withheld, regardless of the location of the public record. Venue for an action against a local public body is proper in the circuit court for the county in which the public record or an office of the public body is located has venue over the action. The court shall determine the matter de novo and the burden is on the public body to sustain its denial. The court, on its own motion, may view the public record in controversy in private before reaching a decision. Failure to comply with an order of the court may be punished as contempt of court.

(5) An action commenced under this section and an appeal from an action commenced under this section shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way.

(6) If a person asserting the right to inspect, copy, or receive a copy of all or a portion of a public record prevails in an action commenced under this section, the court shall award reasonable attorneys' fees, costs, and disbursements. If the person or public body prevails in part, the court may, in its discretion, award all or an appropriate portion of reasonable attorneys' fees, costs, and disbursements. The award shall be assessed against the public body liable for damages under subsection (7).

(7) If the court determines in an action commenced under this section that the public body has arbitrarily and capriciously violated this act by refusal or delay in disclosing or providing copies of a public record, the court shall order the public body to pay a civil fine of $1,000.00, which shall be deposited into the general fund of the state treasury. The court shall award, in addition to any actual or compensatory damages, punitive damages in the amount of $1,000.00 to the person seeking the right to inspect or receive a copy of a public record. The damages shall not be assessed against an individual, but shall be assessed against the next succeeding public body that is not an individual and that kept or maintained the public record as part of its public function.

**History:** 1976, Act 442, Eff. Apr. 13, 1977 ;-- Am. 1978, Act 329, Imd. Eff. July 11,1978 ;-- Am. 1996, Act 553, Eff. Mar. 31, 1997 ;-- Am. 2014, Act 563, Eff. July 1, 2015

3217743v1

## CERTIFICATE THAT THE PUBLIC RECORD DOES
## NOT EXIST UNDER THE NAMES GIVEN

I, Theresa A. Maner, hereby certify that the public records request do not exist under the names given in the June 15, 2016 document request of Mr. Robert Davis. For further information I refer to the responses provided in the Denial Form to which this certificate is attached

Theresa A. Maner
Highland Park School District
FOIA Coordinator

Dated: June 16, 2016

3614135v1

# EXHIBIT K

 Gmail                                    **Robert Davis <davisrobert854@gmail.com>**

---

## Date As To When Demolition of Highland Park High School Is Scheduled to Commence

---

**Robert Davis** <davisrobert854@gmail.com>                          Thu, Jun 16, 2016 at 1:29 PM
To: MLBFOIA <MLBFOIA@michigan.gov>
Cc: "Stone, Clarence (MSHDA)" <stonec@michigan.gov>, "schillers@mhpsnet.org" <schillers@mhpsnet.org>,
Steve Schiller <schiller@hipark.org>

Mr. Ennis:
Pursuant to Michigan's Freedom of Information Act ("FOIA"), I am respectfully requesting to receive copies
of all contracts and notices that are in the possession of the Michigan Land Bank Fast Track Authority that
pertain to the demolition of Highland Park Community High School.  Also please be advised that
legal action may be immediately commence with respect to the funds expended by the Highland Park
Schools' Emergency Manager.  The Michigan Land Bank Authority may have to be a named party in this
litigation.  I look forward to your response to my FOIA request.

Respectfully submitted,
Robert Davis
[Quoted text hidden]

# EXHIBIT L



*State of Michigan*
LAND BANK FAST TRACK AUTHORITY

July 8, 2016

Mr. Robert Davis
davisrobert854@gmail.com

*Via E-Mail*

Dear Mr. Davis:

This written notice is issued in response to your email request dated June 16, 2016 to the State of Michigan Land Bank Fast Track Authority (MLB) for information under the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*, which was received at this office on June 17, 2016.

Your request is granted. Copies of the non-exempt documents are enclosed at no cost.

Sincerely,

Patrick J. Ennis
MLB FOIA Coordinator

Attachments

JS 44 (Rev. 11/15) **CI**

The JS 44 civil cover sheet and the information contained herein neith[er]
provided by local rules of court. This form, approved by the Judicial [
purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON N[*

Case 2:16-cv-12755
Judge: Murphy, Stephen J.
MJ: Majzoub, Mona K.
Filed: 07-26-2016 At 12:26 PM
CMP DAVIS V SCHILLER, ET AL (BG)

ose: Wayne

uired by law, except as
erk of Court for the

## I. (a) PLAINTIFFS

Robert Davis

Wayne

**(b)** County of Residence of First Listed Plaintiff ___Wayne___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Robert Davis, Pro se
180 Eason
Highland Park, MI 48203

**DEFENDANTS**

Steven M. Schiller and
Steve Arwood     Don't Know

County of Residence of First Listed Defendant ___Don't Know___
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Michigan Attorney General
Bill Schuette

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☒ 440 Other Civil Rights
- ☒ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities Employment
- ☐ 446 Amer. w/Disabilities Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729 (a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983, 28 U.S.C. §§ 1331, 1337, 1343, and 1367, 28 U.S.C. 2201

Brief description of cause:
Violation of Plaintiffs voting rights, due process rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____     DOCKET NUMBER _____

DATE   July 25, 2016

SIGNATURE OF ATTORNEY OF RECORD
_____, Pro se Plaintiff

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?        ☐ Yes
                                                                    ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously
          discontinued or dismissed companion cases in this or any other        ☐ Yes
          court, including state court? (Companion cases are matters in which    ☒ No
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :

# New Lawsuit Check List

**Instructions: Put a check mark in the box next to each appropriate entry to be sure you have all the required documents.**

☑ Two (2) completed **Civil Cover Sheets.**

☑ Enter the number of defendants named in your lawsuit in the blank below, add 2 and then enter the total in the blank.

$\underline{2}$ + 2 = $\underline{4}$ **Complaints.**

\# of Defendants          Total

Received by Clerk: _____ Addresses are complete: _____

Case:2:16-cv-12755
Judge: Murphy, Stephen J.
MJ: Majzoub, Mona K.
Filed: 07-26-2016 At 12:26 PM
CMP DAVIS V SCHILLER, ET AL (BG)

☐ If any of your defendants are **government agencies:**
Provide two (2) extra copies of the **complaint** for the U.S. Attorney and the Attorney General.

| If Paying The Filing Fee | If Asking That The Filing Fee Be Waived |
|---|---|
| ☐ Current new civil action filing fee is attached.<br><br>Fees may be paid by check or money order made out to:<br><br>***Clerk, U.S. District Court***<br><br>Received by Clerk: _____ Receipt #:_____ | ☑ Two (2) completed **Application to Proceed in District Court without Prepaying Fees or Costs** forms.<br><br><br><br>Received by Clerk: _____ |

**Select the Method of Service you will employ to notify your defendants:**

| Service via Summons by Self | Service by U.S. Marshal (Only available if fee is waived) | Service via Waiver of Summons (U.S. Government cannot be a defendant) |
|---|---|---|
| ☐ Two (2) completed **summonses** for each defendant including each defendant's name and address.<br><br><br><br><br><br>Received by Clerk: _____ | ☑ Two (2) completed **USM – 285 Forms** per defendant, if you are requesting the U.S. Marshal conduct service of your complaint.<br><br>☑ Two (2) completed **Request for Service by U.S. Marshal** form.<br><br><br>Received by Clerk: _____ | ☐ You need not submit any forms regarding the Waiver of Summons to the Clerk.<br><br>Once your case has been filed, or the Application to Proceed without Prepaying Fees and Costs has been granted, you will need:<br>• One (1) **Notice of a Lawsuit and Request to Waive Service of a Summons** form per defendant.<br>• Two (2) **Waiver of the Service of Summons** forms per defendant.<br><br>Send these forms along with your filed complaint and a self-addressed stamped envelope to each of your defendants. |

**Clerk's Office Use Only**

Note any deficiencies here:

Rev. 4/13